**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

**BERNAFON, INC.,**

Plaintiff,

v.

**BENSON MEDICAL INSTRUMENTS COMPANY,**

Defendant.

Civil No. 02-777 (JNE/JGL)
Civil No. 02-3466 (JNE/JGL)

---

**DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF**

## I. INTRODUCTION

Defendant Benson Medical Instruments Company ("Benson Medical") submits this Opening Claim Construction Brief for U.S. Patent Numbers 5,811,681 ("the '681 Patent") and 6,416,482 ("the '482 Patent"). [Ex. A and Ex. B, respectively].[1] The only claims at issue are independent claims 4 and 6 of the '681 Patent and claims 1, 4 and 9 of the '482 Patent. The '482 Patent is a continuation of the '681 Patent; thus, the scope of '482 Patent's patent claims are affected by arguments made during the prosecution of the '681 Patent.

Both the '681 and the '482 Patents involve audiometers, which are devices used to test hearing, often times of school children and industrial workers. A typical audiometer creates tones that a test subject listens for through headphones. A test protocol is used to deliver tones in a pattern to the test subject such that the test subject's responses (or lack of responses) to the test tones can be interpreted to determine how well the test subject can hear.

---

[1] All Exhibits referred to in Defendant's Opening Claim Construction Brief are attached to the Declaration of Aaron W. Davis, which was submitted concurrently with this brief.

Audiometers were well known before the application for the '681 Patent was filed. In 1996, when the patentees filed their application, numerous audiometer patents already existed as prior art. These prior art patents made up the crowded art field into which the patentees were attempting to enter.

During the prosecution of the '681 Patent, all claims of the application stood rejected in light of three (3) significant pieces of prior art, which will be discussed in detail below. But for the arguments made by the patentees during the prosecution of the '681 Patent application to distinguish their invention from the crowded prior art, neither the '681 Patent nor the '482 Patent would ever have issued.

The patentee's arguments significantly impact the scope of the '681 Patent and the '482 Patent and, thus, the claim construction of terms from those patents. With this claim construction brief, Benson Medical provides the Court with an account of the patentees' arguments that allowed the '681 Patent and the '482 Patent to issue. All of the claim terms in dispute must be construed in light of these prosecution arguments by the patentees. Benson Medical proposes claim construction that does just that.

## II. THE PROSECUTION HISTORY OF THE '681 PATENT AND THE PRIOR ART, HAVE A NARROWING EFFECT ON THE SCOPE OF THE PATENTS AT ISSUE.

"Arguments and amendments made during prosecution of a patent application and other aspects of the prosecution history, as well as the specification and other claims, must be examined to determine the meaning of terms in the claims." Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995); Rheox, Inc. v. Entact, Inc., 276 F.3d 1319, 1325 (Fed. Cir. 2002). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." Southwall Techs., 54 F.3d

at 1576; Pall Corp. v. PTI Techs., Inc., 259 F.3d 1383, 1392-93 (Fed. Cir. 2001) (collecting cases). It is axiomatic that patentees can relinquish a certain meaning or scope of a claim term during prosecution of their patent and that the relinquished meaning or scope may not be recaptured to assert infringement. See Liquid Dynamics Corp. v. Vaughan Co., 355 F.3d 1361, 1367-1368 (Fed. Cir. 2004).[2] A disavowal in the prosecution history of claim coverage narrows the scope of a claim notwithstanding the plain meaning of the claim language, and notwithstanding an explicit definition of a claim term in the specification that would otherwise cover an accused product, because the specification was written before confronting the prior art. See, e.g., Rheox, 276 F.3d at 1327 (holding that although the specification supported the patentee's construction of a term, it was apparent that the patentee relinquished the proposed claim scope during prosecution).

Defendant's claim construction position seeks to hold Plaintiff to the scope-narrowing arguments that the patentees themselves made during the prosecution of the '681 Patent. In Southwall Techs., Inc. v. Cardinal IG Co., the Federal Circuit discussed a patentee who had, in response to an examiner's rejection, disclaimed a particular interpretation of a claim term. During subsequent litigation, the patentee sought an interpretation of that same claim term that recaptured the interpretation disclaimed during prosecution. The district court rejected the patentee's attempt at reclaiming disavowed claim scope. On appeal, the Federal Circuit affirmed, reasoning that "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." 54 F.3d at 1575-77.

---

[2] The Supreme Court has long upheld the doctrine of prosecution disclaimer. See Schriber-Schroth Co. V. Cleveland Trust Co., 311 U.S. 211, 220-221 (1940); Crawford v. Heysinger, 123 U.S. 589, 602-604 (1887).

Here, the prosecution history clearly illustrates that the patentees narrowed the meaning and scope of their invention and did so in order to obtain the '681 Patent and the '482 Patent. All Defendant seeks to define the scope of the claim terms consistent with what the patentees themselves said when they argued over the prior art during prosecution.

### A. PRIOR ART TO THE '681 PATENT AND THE PATENTEES' ARGUMENTS RELATED TO THAT PRIOR ART.

As stated above, during its prosecution, the '681 Patent was finally rejected in light of three (3) prior art patents. In order to secure the allowance of the '681 Patent, the patentees made arguments wherein they clearly defined the limited scope of their invention. To put the patentees' disclaimer in context, each of the three (3) prior art patents are discussed briefly below, along with the arguments that the patentees made regarding that prior art.

#### 1. The Moser Patent and the Patentees' Related Arguments.

U.S. Patent No. 4,847,763 to Moser et al (hereinafter "Moser Patent") issued on July 11, 1989 and disclosed an audiometer that was made up of a computer that controlled a CD player, which played a disc that contained a number of pre-stored test signals. [See Ex. E, Col. 14, lns. 27-54]. Generally, the audiometer disclosed in the Moser Patent is a sound source (CD player) and a computer. [Ex. E, Col. 7, lns. 9-40 and Figure 1; see also Ex. C, paper no. 10, pp. 8-9]. Moser also discloses the use of a video disc player "to reproduce audible audiologic test signals and visual pictures." [Ex. E, Col. 3, lns. 31-36].

During prosecution of the '681 Patent, the Examiner rejected claim 11 as being anticipated by the Moser Patent. [See Ex. D, paper no. 6 and Ex. D]. Although claim 11 is not is dispute here, the term "conventional audiometer" and other terms contained in claim 11 and other claims are in dispute. Therefore, the patentees' arguments regarding claim terms made for the allowance of claim 11 are also relevant as to how those same claim terms are construed in

other claims. See Digital Biometrics, Inc. v. Identix, Inc. 149 F.3d 1335, 1347-48 (Fed. Cir. 1998) ("Absent qualifying language in the remarks, arguments made to obtain the allowance of one claim are relevant to interpreting other claims in the same patent."). Moreover, the patentees likened the Moser invention to another prior art patent (the "Slavin Patent," discussed below), which had to be argued around in order to obtain allowance of claims 4 and 6 that are at issue here. Accordingly, the patentees' arguments regarding the Moser Patent are directly relevant to the construction of the disputed claim terms.

To obtain allowance of their patent, the patentees argued that their invention included a "conventional audiometer" and a computer. [See Ex. C, paper no. 10, pp. 8-9]. In particular, the patentees argued that the:

> conventional audiometer is, in effect, the Moser device, i.e., a sound source and a computer. The audiometer includes stored sound sequences that are selected by a processor of the audiometer to be output in a select succession or predetermined program according to a logical procedure responsive to a test subject's input. The audiometer, thus includes the stored sound sequence function of the CD player. . . and the test sequencing function of the computer (albeit an internal processor or logic circuitry, rather than a stand alone external computer). In addition to this conventional audiometer analogous to the Moser device, Applicant's claimed invention includes another computer with its own processor, memory and peripherals.

[Ex. C, paper no. 10, pp. 8-9]. In other words, the Moser Patent described a CD player (sound source) and a computer, which taken together comprised a "conventional audiometer." According to the patentees' arguments above, the '681 Patented invention is that the test logic circuitry (contained in the computer in the Moser Patent) and the sound source (in the CD player in Moser) are taken together as one, in the "conventional audiometer." Thus, what was separated in the Moser Patent is together as a "conventional audiometer" in the '681 Patent.

Based on the clear statements of the patentees, the invention of the '681 Patent must include yet another computer and "the Moser device" or "conventional audiometer," which has

stored sound and test sequences that are controlled by an internal logic circuitry. [Ex. C, paper 10, p. 9]. In fact, the patentees explicitly differentiated their invention from that of the Moser Patent when they stated, "Applicants' claimed invention, on the other hand, comprises a computer and a conventional audiometer." [Ex. C, paper 10, p. 8]. The Moser Patent only contained the "conventional audiometer" (a sound source and a computer), albeit as two separate components. Thus, not only must the invention of '681 Patent be limited to a sound source and computer contained together in a single component (the "conventional audiometer"), the scope of the '681 Patent is also limited to audiometric systems that contain a conventional audiometer and a separate computer.

If these limitations are not included, the patentees will have been allowed to reclaim what they disavowed during the prosecution of the '681 Patent. Such attempted retrieving of previously disavowed claim scope is contrary to the dictates of the Federal Circuit. See Southwall Techs., 54 F.3d at 1576 ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."); Digital Buimetrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1347 (Fed. Cir. 1998) ("The public has a right to rely on … definitive statements made during prosecution."). The patentees stated that the combination of a computer and a conventional audiometer was a "tremendous advantage of Applicant's claimed invention." [Ex. C, paper no. 10, pp. 8-9]. Thus, all claims must be read in light of this computer-and-conventional-audiometer requirement. The patentees also made other scope-narrowing arguments in light of the prior art; these other arguments will be discussed in detail below.

### 2. The Delisle Patent and the Patentees' Related Arguments.

During the prosecution of the '681 Patent, the Examiner also rejected claims 3 and 5, now disputed claims 4 and 6, as being obvious in view of U.S. Patent Number 3,809,811[3] (hereinafter "the Delisle Patent"). [See Ex. D, paper no. 6, p. 3 and Ex. F]. As the Examiner stated, the Delisle Patent disclosed:

> an automatic audiometer which utilizes a tape player to instruct the subject how to take the audiometer test and which provides the subject with some of the testing sounds when needed within the test itself.

[Ex. D, paper no. 6, p. 3]. In other words, the Delisle Patent disclosed a tape player with pre-recorded instructions and a test tone generation. In response to the Examiner's rejection, the patentees argued that the tape player of the Delisle Patent, like the CD player of the Moser Patent, "does not perform any logical testing procedures [and] is controlled by a computer to select the tape player output." [Ex. C, paper no. 10, p. 11]. The patentees continued by arguing:

> The amendments to Applicant's claims particularly illustrate the distinction that a conventional audiometer performing a select logical testing procedure (not merely providing detectable output) is controlled by a computer that adds multimedia features to the testing.

[Ex. C, paper no. 10, p. 11]. In other words, the invention of the '681 Patent includes a conventional audiometer, which itself performs logical testing procedures, <u>and</u> a computer which controls the conventional audiometer. This is unlike the invention of the Delisle Patent wherein the tape player only provides output, and performs no logical testing procedures. Again, all claims of the '681 Patent must incorporate both a conventional audiometer, which performs logical testing procedures (i.e., contains pre-programmed testing logic of its own), <u>and</u> a separate multimedia computer, otherwise the patentee would reclaim surrendered subject matter.

3 Exhibit F. ("Delisle Patent").

**3. The Slavin Patent and the Patentees' Related Arguments.**

Lastly, the Examiner also rejected the predecessor claims of claims 4 and 6, as being obvious in view of U.S. Patent Number 4,489,610[4] (hereinafter "Slavin Patent"). [See Ex. D, paper no. 6, pp. 5-6 and Ex. G]. The Slavin Patent again discloses a tone generator that applies a predetermined sequence of sounds to test a subject's hearing. [Ex. G, Col. 4, lns. 55-69 and Col. 5, lns. 1-6]. The tone generator is connected to a computer that controls the tone sequence. [Id.; see also Ex. G, Fig. 1]. The patentees stated that the claimed invention includes an "audiometer that performs a select logical testing procedure and the computer that controls the audiometer and adds multimedia." [Ex. C, paper no. 10, pp. 11-12]. The patentees also stated, "the tone generator [*of Slavin*] merely provides tones as directed by the computer, and does not include any logical operations. . . . Applicant's amended claims particularly point out the computer control of the audiometer and that the fact that the audiometer, itself, performs select logical testing procedures." [Ex. C, paper no. 10, pp. 10-12]. "The Slavin tone generator and audible instruction generator do not provide these features." [Ex. C, paper no. 10, p. 11]. The arguments made by the patentees to differentiate their invention from the tone generator and computer invention of the Slavin Patent were successful. Again, each of the claims at issue must be limited to a device having at least a conventional audiometer (with its own pre-programmed logic) and a separate computer.

The Moser, Delisle, and Slavin Patents all disclose a computer connected to another device (in Moser, a CD player; in Delisle, a tape player; and in Slavin, a tone generator), wherein that device itself contains no pre-programmed logic and the computer controls the device. The patentees specifically distanced themselves from that prior art and asserted that, in their

[4] Exhibit G. ("Slavin Patent").

invention, the conventional audiometer contained its own computer and pre-programmed logic, and that a second computer was present that provided multimedia functions. [Ex. C, paper 10, pp. 9-12].

Moreover, it is well known in patent law that the prosecution history of a parent application, in this case the '681 Patent, limits the scope of a later child application, here the '482 Patent, using the same claim terms. See Augustine Medical, Inc. v. Gaymar Industries, Inc., 181 F.3d 1291, 1300 (Fed. Cir. 1999).[5] Therefore, any arguments made during the prosecution of the '681 Patent, specifically the arguments regarding the Moser, Delisle, and Slavin Patents, also apply to the child of the '681 Patent, the '482 Patent. This ensures that the patentees are not able to recapture in the '482 Patent that which they had disclaimed during the prosecution of the '681 Patent. See Southwall Techs., 54 F.3d at 1576 ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

Thus, all claims of the '681 Patent and the '482 Patent must be limited to include both: (1) a conventional audiometer, which includes pre-programmed logic; and (2) a computer with multimedia functions.

### B. THE DISPUTED CLAIM TERMS AND DEFENDANT'S PROPOSED CONSTRUCTION.

The following is Defendant's proposed claim construction for disputed claim terms of the '681 and '482 Patents. These definitions reflect the patentees' arguments during the prosecution of the '681 Patent, as well as the specification and other claims, all which affect the construction of terms from the '681 Patent and the related '482 Patent.

[5] See also Alloc, Inc. v. International Trade Commission, 342 F.3d 1361, 1372 (Fed. Cir. 2003).

1. **Conventional Audiometer** (claim 4 of '681 Patent):

Proposed Construction: microprocessor circuitry, audio circuitry, and pre-programmed logic for the hearing test

During the prosecution of the '681 Patent, the patentees made many specific statements as to what a "conventional audiometer" is and is not, as well as what it contains. "[A] claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or the prosecution history." Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1370 (Fed. Cir. 2003). In his declaration, Steve Benson (one of ordinary skill in the art of audiometers) states that the term "conventional audiometer" has no "ordinary meaning" in the art of audiometers and that he had never heard the term "conventional audiometer" until he read Plaintiff's patents. [Ex. H (Benson Declaration), ¶¶ 2-3]. Thus, the patentees have acted as their own lexicographers. The Court must then turn to the prosecution history, as well as the specification and the other claims, to determine the meaning and scope of the term "conventional audiometer." See Southwall Techs., 54 F.3d at 1576.

As stated above, the prosecution history contains a number of arguments by the patentees that illustrate what a "conventional audiometer" is and is not. In order to obtain allowance of the '681 Patent, the patentees argued that the convention audiometer performed logical testing procedures dictated by pre-programmed logic. [Ex. C, paper 10, pp. 9-10]. That the conventional audiometer contained pre-programmed logic for the hearing test was of particular importance, because neither Moser, Slavin, nor Delisle included pre-programmed testing logic in the device that produced the test tones device (in Moser, a CD player, in Delisle, a tape player, and in Slavin, a tone generator). [See Ex. C, paper 10, pp. 8-12]. This was one of the arguments

that made it possible for the '681 Patent to issue. Accordingly to the patentees then, a "conventional audiometer" must include pre-programmed logic for the hearing test.

Also, the specification states that "[t]he conventional audiometer is generally comprised of three parts: microprocessor circuitry, audio circuitry, and certain optional elements." [Ex. A, Col. 4, lns. 37-39]. It is hard to imagine that the conventional audiometer could serve its purpose of testing hearing without at least the first two elements, the microprocessor circuitry and the audio circuitry. This is confirmed in the prosecution history, because the patentees argued over the Moser Patent by stating that the conventional audiometer included an internal processor or logic. [Ex. C, paper 10, p. 9]. The specification also states that the conventional audiometer generates test tones. [See, e.g., Ex. A, Col. 5, lns. 55-57 and Col. 10, lns. 56-62]. These test tones are generated by the audio circuitry of the conventional audiometer. [Ex. A, Col. 5, lns. 15-24]. This evidence from the prosecution history and the specification give meaning to the claim terms for purposes of claim construction. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) ("For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims."); Altiris, 318 F.3d at 1370. Microprocessor circuitry, audio circuitry, and pre-programmed logic are all required by the specification and prosecution history and describe clearly what, at a minimum, a "conventional audiometer" must include. [See also Ex. A, Col. 7, lns. 4-10].

**2. Computer** (claim 4 of '681 Patent and claim 4 of '482 Patent):

Proposed Construction: a computer with multimedia functions

Plaintiff is limited to the proposed construction of the above terms because the patentees repeatedly argued during prosecution of the '681 Patent that the invention included a "computer with multimedia functions." In response to the rejection based on the Moser Patent, the

patentees argued that the computer "allows multimedia functions to be added to the conventional audiometer." [Ex. C, paper 10, p. 9]. The patentees continued by arguing that "[t]his is an essence and tremendous advantage of Applicant's claimed invention. Applicants can use a conventional audiometer, add a computer with multimedia operations and achieve an entirely or substantially automated testing environment." [Id.]. In response to the rejection by the Delisle Patent, the patentees argued that a distinction between their and Delisle's invention was that the patentees included a conventional audiometer that "is controlled by a computer that adds multimedia features to the testing." [Ex. C, paper 10, p. 11]. Therefore, any use of the term "computer" in the '681 and '482 Patents must be construed as a "computer having multimedia features."

**3. Audiometer** (claim 6 of '681 Patent and claim 1 of '482 Patent):

Proposed Construction: a computer and a conventional audiometer

Plaintiff is limited to the proposed construction of the above term because the patentees repeatedly argued that their device was different because it included a "conventional audiometer and a computer." [Ex. C, paper 10, pp. 9-12, as discussed above]. For example, the patentees stated during the prosecution of the '681 Patent that their "claimed invention includes the audiometer that performs a select logic testing procedure and the computer that controls the audiometer and adds multimedia." [Ex. C, paper 10, p. 12]. The patentees amended the preamble of what would become claim 4 of the '681 Patent to define the term "multimedia audiometer"[6] as "including a conventional audiometer and a computer." [Ex. C, paper 10, p. 2]. In fact, the patentees' explicitly stated when arguing over Moser that their "claimed invention, on

[6] Defendant originally proposed that "multimedia audiometer" should be construed by the Court as well. However, Defendant now believes that with the proper definition of "audiometer," no separate construction of "multimedia audiometer" is necessary. Therefore, Defendant withdraws "multimedia audiometer" from consideration for construction.

the other hand, comprises a computer and a conventional audiometer." [Ex. C, paper 10, p. 8]. Therefore, any audiometric system claimed by the patentees must be that of a "multimedia audiometer." To allow any construction of the term "audiometer" broader than that proposed by Defendant (i.e., reading out the testing logic of the conventional audiometer) would allow Plaintiff to recapture that which the patentees relinquished during prosecution in order to overcome the three (3) prior art patents discussed above. See Southwall Techs., 54 F.3d at 1576 ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

4. **Means For Switching** (claim 4 of the '681 Patent):

| | |
|---|---|
| Structure required to be imported pursuant to 35 U.S.C. § 112 ¶ 6 is: | mechanical switches in the conventional audiometer and statutory equivalents thereof |

A "means plus function" limitation of a claim must be construed to cover the corresponding structure, materials, or acts described in the specification and equivalents thereof. See 35 U.S.C. § 112 ¶ 6. The specification of the '681 Patent provides, "the computer 102 may then control 330 the basic audiometer 200 to trigger the relays 64a,b to close the switches 66a and to open the switches 66b." [Ex. A, col. 12, lns. 28-31]. Additional illustration of the mechanical switches 66a and 66b can be found in Figure 6 of the '681 Patent. [Ex. A, Fig. 6]. When a patentee opts to use means language his claims are limited to the corresponding structure found in the specification and its equivalent. See In re Donaldson Company, Inc., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (where the Federal Circuit held that 112, paragraph 6 requires means language be construed in light of the specification regardless of the action). Here, since the patentees opted to use means language, Plaintiff is limited to the corresponding structure of the specification, i.e., mechanical switches (66a and 66b) in the conventional audiometer.

**5. Sound Wave Generator** (claim 6 of the '681 Patent):

Proposed Construction: sound wave generator in the computer

With "sound wave generator," Defendant is not seeking a specialized meaning to be given the term "sound wave generator." However, Defendant is asking the Court to construe the term so as to define its scope, in this case, the location of the "sound wave generator" within the patentee's audiometer. This is proper, because the Court, as a matter of law, must determine the scope and meaning of patent claim terms. See Markman, 52 F.3d at 978 ("a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law"); Minton v. National Ass'n. of Securities Dealers, Inc., 336 F.3d 1373, 1376 (Fed. Cir. 2003) (claim construction is a legal determination during which the court determines the scope and meaning of the patent claims).

As stated previously, the conventional audiometer and the computer make up the patentees' audiometer. [Ex. A, Col. 7, lns. 13-19]. In the specification of the '681 Patent, the patentees stated that the computer "should be capable of producing sound waves and/or visual images from representative digital information stored, generated, and/or manipulated within or by the computer." [Ex. A, col. 7, lns. 24-28]. Moreover, the specification states that "[t]he test subject may receive a multimedia sound message, generated by the computer." [Ex. A, Col. 11, lns. 5-7]. Accordingly, the sound wave generation must occur in the computer, rather than in the conventional audiometer.

**6. Means For Controlling** (claim 4 of the '681 Patent):

| | |
|---|---|
| Structure required to be imported pursuant to 35 U.S.C. § 112 ¶ 6 is: | the computer and triggering relays from the conventional audiometer and statutory equivalents thereof |

This is a "means plus function" limitation, therefore, again, the Court must look to the specification for the accompanying structure. See 35 U.S.C. § 112 ¶ 6. The specification states that the "computer may control the basic audiometer. . . . This control may trigger relay 64a and relays 64b to close the switches 66a and open the switches 66b." [Ex. A, Col. 10, lns. 8-13]. By this, the patentees illustrated that the computer and the triggering relays from the conventional audiometer are the means for controlling.

**7. Means For Outputting Sound Signals** (claim 4 of the '681 Patent):

| | |
|---|---|
| Structure required to be imported pursuant to 35 U.S.C. § 112 ¶ 6 is: | sound port of the multimedia computer, the multimedia input interface, and the multimedia talkover card and statutory equivalents thereof |

This is another "means plus function" claim limitation. See 35 U.S.C. § 112 ¶ 6. The specification states that "sound signals passed to the sound port from the computer over the multimedia input interface are delivered through the amplifier of the multimedia talkover card and through the earphone jack to the earphone speakers." [Ex. A, Col. 10, lns. 13-19]. Box 340 in Figure 7 of the '681 Patent also states that the "computer selects and outputs sound file(s) representing instructions/closing messages; output over multimedia interface." [Ex. A, Fig. 7, Box 340]. Based on this disclosure in the specification and figures, the required imported structure is the sound port from the multimedia computer, the multimedia input interface, and the multimedia talkover card and statutory equivalents thereof.

**8. Test Signal Generator** (claim 6 of '681 Patent):

Proposed Construction: test signal generator in a conventional audiometer

**Tone Generator** (claim 4 of '482 Patent):

Proposed Construction: tone generator in a conventional audiometer

Again, Defendant is asking the Court to determine the scope of the claim terms, not give them some specialized meaning. See Markman, 52 F.3d at 978. The "test signal generator" a/k/a the "tone generator" produces test tones. To overcome the examiner's rejection with Moser, the patentees argued that their "invention differs in that the audiometer that provides the test signals has certain logical capabilities to conduct the test responsive to the test subject's inputs." [Ex. C, paper 10, p. 11]. Therefore, the tone generator (a/k/a test signal generator) of the '681 and '482 Patents must be located in the conventional audiometer.

9. **Means For Outputting Test Signals** (claim 4 of '681 Patent):

| | |
|---|---|
| Structure required to be imported pursuant to 35 U.S.C. § 112 ¶ 6 is: | tone generator in the conventional audiometer and statutory equivalents thereof |

This is another "means plus function" claim limitation. See 35 U.S.C. § 112 ¶ 6. The specification states that "the basic audiometer operates to generate test tones delivered to the test subject" and that "the basic audiometer may continue to generate successive test tones according to the particular test protocol." [Ex. A., Col. 10, lns. 56-62]. The specification also states that "[t]he test subject wearing the earphone speakers will then receive test tones generated by the conventional audiometer." [Ex. A, Col. 5, lns. 55-57]. Based on this explicit disclosure in the specification, the structure required is a tone generator in a conventional audiometer and statutory equivalents thereof.

10. **Generating A Test Tone** (claim 9 of '482 Patent):

| | |
|---|---|
| Proposed Construction: | generating a test tone from a conventional audiometer |

With "generating a test tone," Defendant is asking the Court to determine the scope of the claim term, not give it some specialized meaning. See Markman, 52 F.3d at 978. The

prosecution history limits the conventional audiometer alone to generating the test tones. [Ex. C, paper 10, p. 11]. Therefore, all test tones must be generated in the conventional audiometer.

**11. A Logic Circuit Connected With The Test Signal Generator And Processor** (claim 6 of the '681 Patent):

Proposed Construction: a logic circuit to run the hearing test in the conventional audiometer connected with the test signal generator and processor

Regarding the construction of this phrase, Defendant is only asking the Court to determine the scope of the claim term, not give it some specialized meaning. See Markman, 52 F.3d at 978. As was discussed above, the test signal generator must be construed as being in the conventional audiometer. [Section #8 above]. During prosecution of the '681 Patent, the patentee stated that the "amended claims particularly pointed out the computer control of the audiometer and the fact that the audiometer, itself, performs select logical testing procedures." [Ex. C, paper no. 10, p. 11]. The patentees went on to argue that their "amended claims particularly point out that the multimedia computer controls the audiometer and that the audiometer, itself, performs select logical testing procedures." [Ex. C, paper no. 10, p. 12]. They even argued that their invention differed from Moser, because the conventional audiometer included a test sequencing function in the form of "logic circuitry." [Ex. C, paper no. 10, p. 9]. Thus, there can be no question that the logic circuit to run the hearing test is located in the conventional audiometer.

**12. Wherein The Logic Circuit And The Sound Wave Generator Are Controlled By The Processor To Selectively Cause Either The Sound Wave Generator Or The Test Signal Generator To Output Discernable Signals** (claim 6 of the '681 Patent):

Proposed Construction: wherein the logic circuit of the conventional audiometer and the sound wave generator of the computer with multimedia functions are controlled by the processor to selectively cause either the sound wave generator of the

computer with multimedia functions or the test signal generator in the conventional audiometer to output discernable signals

With the construction of the "wherein" clause, Defendant is asking the Court to determine the scope of the claim term, not give it some specialized meaning. See Markman, 52 F.3d at 978 ("a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law"). In fact, all that has been added to the "wherein" are the definitions forwarded by Defendant earlier in this brief. This defining of the claim term's scope will assist in clarifying for the jury where each of the many components is located in the multimedia audiometer.

**13. Sound Signals Generated From Digital Information** (claim 1 of '482 Patent):

Proposed Construction: sound signals generated from digital information stored in the computer

Again, with the construction of this phrase, Defendant is only asking the Court to determine the scope of the claim term, not give it some specialized meaning. See Markman, 52 F.3d at 978. To give context as to what generates the digital information, the specification of the '482 Patent states "[t]he particular sound signals so passed to the earphone speakers may be derived from digital information stored or generated in, or read by, the computer." [Ex. B, Col. 10, lns. 28-30]. The specification goes on to provide that "[t]he test subject may … receive the following instructions generated from the digital data stored by [the] computer." [Ex. B, col. 11, lns. 37-39]. Based on the context supplied by the specification, the sound signals generated from digital information must be stored in the multimedia computer.

**14. Pre-programmed logic** (claim 4 of '681 Patent):

Proposed Construction: pre-programmed logic for the hearing test

The construction of "pre-programmed logic" is more about the defining of scope of the term than giving the term a specialized meaning. See Markman, 52 F.3d at 978. This scope of the term was discussed in the prosecution history of the '681 Patent when the patentees affirmatively stated that "the amendment [over Moser] provides that [the] instrument for conducting a test protocol includes a testing device for performing a testing sequence dictated by pre-programmed logic." [Ex. C, paper 10, p. 10 (emphasis added)]. Thus, the pre-programmed logic in the conventional audiometer must include the logical testing procedure. [See Ex. C, paper 10, p. 11].

**15. Analog Sound** (claim 9 of the '482 Patent):

Proposed Construction: continuously variable, measurable, physical quantities perceived by the sense of hearing

The term "analog sound" has its ordinary and customary meaning. The Federal Circuit has long held "that dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002). The term "analog" is defined as "[o]f, relating to, or being a device in which data are represented by continuously variable, measurable, physical quantities, such as length, width, voltage, or pressure." [Ex. I, The American Heritage Dictionary of the English Language, 65 (4th ed. 2000)]. "Sound" is defined as a "sensation perceived by the sense of hearing." [Ex. J, Webster's Third New International Dictionary of The English Language, Unabridged, 2176 (2002)]. Therefore, "analog sound" means a "continuously variable, measurable, physical quantities perceived by the sense of hearing."

**16. Analog Signal** (claim 9 of the '482 Patent):

Proposed Construction: a continuously variable, measurable, physical quantity or impulse (as a voltage, current, or magnetic field strength) by which messages or information can be transmitted

The term "analog signal" also has its ordinary and customary meaning. As stated above, the term "analog" is defined as "[o]f, relating to, or being a device in which data are represented by continuously variable, measurable, physical quantities, such as length, width, voltage, or pressure." [Ex. I, The American Heritage Dictionary of the English Language, 64 (4th ed. 2000)]. The term "signal" is defined as "a detectable physical quantity or impulse (as a voltage, current, or magnetic field strength) by which messages or information can be transmitted." [Ex. J, Webster's Third New International Dictionary of The English Language, Unabridged, 2115 (2002)]. Accordingly, "analog signal" means "a continuously variable, measurable, physical quantity or impulse (as a voltage, current, or magnetic field strength) by which messages or information can be transmitted."

**17. Additional Claim Terms Identified by Defendant in the Parties' Joint Statement.**

Although it identified the following claim terms as disputed and in need of construction, Defendant now withdraws its request for these terms to be construed:

(a) Selectively cause(s) (claim 6 of the '681 Patent and claim 4 of the '482 Patent);

(b) Selectively switch (claim 1 of the '482 Patent);

(c) Switching (claim 1 and 9 of the '482 Patent);

(d) The computer controls the switch (claim 4 of the '482 Patent); and

(e) First switching (claim 1 of the '482 Patent).

Defendant reserves the right to rebut any proposed constructions that Plaintiff forwards for any of the above terms, particularly "first switching." Also, Defendant originally proposed

that "multimedia computer" should be construed by the Court as well. However, Defendant now believes that with the proper definition of "computer," no separate construction of "multimedia computer" is necessary. Therefore, Defendant withdraws "multimedia computer" from consideration for construction as well.

## III. PRAYER FOR RELIEF

Defendant respectfully requests that the Court construe the above claim terms as proposed by Defendant and as summarized in the Proposed Order submitted by Defendant.

Dated: July 2, 2004

By: s/ Aaron W. Davis

Randall T. Skaar (No. 165,013)
Aaron W. Davis (No. 318,255)
PATTERSON, THUENTE, SKAAR & CHRISTENSEN, P.A.
4800 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2100
Telephone: (612) 349-5740
Facsimile: (612) 349-9266

Joanne H. Turner (No. 235,787)
MACKALL, CROUNSE, & MOORE, PLC.
1400 AT&T Tower
901 Marquette Avenue
Minneapolis, MN 55402
Telephone: (612) 305-1400
Facsimile: (612) 305-1414

**ATTORNEYS FOR DEFENDANT BENSON MEDICAL INSTRUMENTS COMPANY**