**Exhibit D**

UNITED STATES OF AMERICA

Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO. |
|---|---|---|---|
| 08/639,694 | 04/29/96 | BRAUN | L 20609.5 |

EXAMINER: FINLEY, S

B2M1/0825

H DALE LANGLEY JR.
HAYNES AND BOONE
3100 NATIONSBANK PLAZA
901 MAIN STREET
DALLAS TX 75202-3789

| ART UNIT | PAPER NUMBER |
|---|---|
| 2212 | 6 |

DATE MAILED: 08/25/97

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

## OFFICE ACTION SUMMARY

☐ Responsive to communication(s) filed on ____________.

☐ This action is **FINAL.**

☐ Since this application is in condition for allowance except for formal matters, **prosecution as to the merits is closed** in accordance with the practice under *Ex parte Quayle*, 1935 D.C. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire 3 month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☑ Claim(s) 1-22 is/are pending in the application.
Of the above, claim(s) ____________ is/are withdrawn from consideration.
☐ Claim(s) ____________ is/are allowed.
☑ Claim(s) 1-22 is/are rejected.
☐ Claim(s) ____________ is/are objected to.
☐ Claim(s) ____________ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.
☐ The drawing(s) filed on ____________ is/are objected to by the Examiner.
☐ The proposed drawing correction, filed on ____________ is ☐ approved ☐ disapproved.
☐ The specification is objected to by the Examiner.
☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.
☐ received in Application No. (Series Code/Serial Number) ____________.
☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: ____________.

☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☑ Notice of Reference Cited, PTO-892
☑ Information Disclosure Statement(s), PTO-1449, Paper No(s). 5
☐ Interview Summary, PTO-413
☐ Notice of Draftperson's Patent Drawing Review, PTO-948
☐ Notice of Informal Patent Application, PTO-152 ☑ Notice of Informal Drawings

--SEE OFFICE ACTION ON THE FOLLOWING PAGES--



EXHIBIT D

## Part III DETAILED ACTION

### *Oath/Declaration*

1. No post office address has been designated anywhere in the application papers. However, applicant's residence as given in the oath or declaration, includes a full street address. The given address will be presumed to be applicant's post office address. If the above is incorrect, applicant should submit a statement as to post office address in response to this Office action.

### *Drawings*

2. This application has been filed with informal drawings which are acceptable for examination purposes only. Formal drawings will be required when the application is allowed.

### *Specification*

3. The lengthy specification has not been checked to the extent necessary to determine the presence of all possible minor errors. Applicant's cooperation is requested in correcting any errors of which applicant may become aware in the specification.

### *Claim Rejections - 35 USC § 102*

4. The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> *A person shall be entitled to a patent unless --*
>
> *(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.*

5. Claim 11 us rejected under 35 U.S.C. 102(b) as being clearly anticipated by **Moser et al. (US 4,847,763)**.

6. Claims 1-2 and 22 are rejected under 35 U.S.C. 102(b) as being anticipated by **Slavin (US 4,489,610)**.

**Slavin** discloses controlling an audiometer to selectively switch the audiometer output between test tones and sound signals generated from digital information (see column 2 lines 25-50).

*Claim Rejections - 35 USC § 103*

7. The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> *(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.*

8. This application currently names joint inventors. In considering patentability of the claims under 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of 35 U.S.C. 103(c) and potential 35 U.S.C. 102(f) or (g) prior art under 35 U.S.C. 103(a).

9. Claims 1-22 are rejected under 35 U.S.C. 103(a) as being unpatentable over **Delisle et al. (US 3,809,811)**.

**Delisle et al.** discloses an automatic audiometer which utilizes a tape player to instruct the subject how to take the audiometer test and which provides the subject with some of the testing sounds when needed within the test itself. The tape within the tape player is an endless tape with special indicators for the computer to locate when the tape is to be played or stopped.

As for claims 1-3, 5-9, and 21-22, **Delisle et al.** discloses the claimed invention except for the sound signals being generated from stored digital information. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize digital information for the generation of the sound signals since the examiner takes Official Notice of the equivalence of an analog tape player and a digital tape player for their use in the sound recording and reproducing art and the selection of any of these known equivalents to produce sound signals would be within the level of ordinary skill in the art. Furthermore, it is well known in the art of modern communications that sound signals stored digitally and converted to analog signals at a later time provide a better control of

the sound produced and require less memory or space for the storage of the sound signal as evidenced by the wide use and quality of audio CDs.

As for claim 4, **Delisle et al.** discloses the claimed invention except for the computer outputting the sound waves. It would have been obvious to one having ordinary skill in the art at the time the invention was made to have the computer to output the sound waves since it was known in the art that any computer which includes a sound card can produce stored sounds, even sounds stored on a tape player by interfacing the tape player and the sound card and **Delisle et al.** clearly discloses that the computer disclosed controls the tape player.

As for claim 10, **Delisle et al.** discloses the claimed invention except for the use of a talkover card. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a talkover card since it was known in the art that conventional audiometer testers had the option of including a talkover card which allowed the test operator to instruct the subject on how to perform the test (disclosed by Applicant on page 10 lines 15 page 11 line 5 as part of the prior art).

As for claims 11-13, **Delisle et al.** discloses the claimed invention except for a digital data storage for storing digital data and a multimedia convertor, the multimedia convertor converts the digital data to an analog signal. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize digital information (and therefore a digital data storage for storing digital data and a multimedia convertor for converting the digital data to an analog signal) for the generation of the sound signals since the examiner takes Official Notice of the equivalence of an analog tape player and a digital tape player for their use in the sound recording and reproducing art and the selection of any of these known equivalents to produce sound signals would be within the level of ordinary skill in the art. Furthermore, it is well known in the art of modern communications that sound signals stored digitally and converted to analog signals at a later time provide a better control of the sound produced and require less memory or space for the storage of the sound signal as evidenced by the wide use and quality of audio CDs.

As for claims 14-15 and 18, **Delisle et al.** discloses the claimed invention except for a multimedia input interface communicatingly connecting the computer and the basic audiometer. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a multimedia input interface communicatingly connecting the computer and the basic audiometer. It would have been obvious to one having ordinary skill in the art at the time the

invention was made to utilize digital information (and therefore a multimedia input interface communicatingly connecting the computer and the basic audiometer) for the generation of the sound signals since the examiner takes Official Notice of the equivalence of an analog tape player and a digital tape player for their use in the sound recording and reproducing art and the selection of any of these known equivalents to produce sound signals would be within the level of ordinary skill in the art. Furthermore, it is well known in the art of modern communications that sound signals stored digitally and converted to analog signals at a later time provide a better control of the sound produced and require less memory or space for the storage of the sound signal as evidenced by the wide use and quality of audio CDs and **Delisle et al.** clearly discloses that the computer disclosed controls the tape player through the interface 15.

As for claims 16 and 20, **Delisle et al.** discloses the claimed invention except for the computer outputting the sound waves. It would have been obvious to one having ordinary skill in the art at the time the invention was made to have the computer to output the sound waves since it was known in the art that any computer which includes a sound card can produce stored sounds, even sounds stored on a tape player by interfacing the tape player and the sound card and **Delisle et al.** clearly discloses that the computer disclosed controls the tape player.

As for claims 17 and 19, **Delisle et al.** clearly discloses multiplexer switch (36) for switching between the output of the tape player (12) and the basic audiometer (frequency control 18, oscillator 20, relay 22, and amplitude control 26).

10. Claims 3-13 and 21-22 are rejected under 35 U.S.C. 103(a) as being unpatentable over **Slavin**.

As for claim 3, **Slavin** discloses the claimed invention except for the means for switching between the means for outputting sound signals and the means for outputting test tones and a means for controlling the means for switching. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a means for switching between the means for outputting sound signals and the means for outputting test tones and a means for controlling the means for switching in addition to the CPU disclosed, since it has been held that it is not an inventive step to make that which was integral into various elements and the CPU disclosed by **Slavin** performs both the switching between the means for outputting sound signals and the means for outputting test tones and controls the switching as necessary.

As for claim 4, **Slavin** discloses the claimed invention except for a switch connected with the computer and the tone generator and wherein the switch selectively causes either the tone generator or the computer to output sound waves and the computer controls the switch. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a switch in addition to the CPU disclosed, since it has been held that it is not an inventive step to make that which was integral into various elements and the CPU disclosed by **Slavin** controls the output of the tone generator and the audible instruction generator. Furthermore, It would have been obvious to one having ordinary skill in the art at the time the invention was made for the computer to output sound waves as **Slavin** clearly discloses at column 2 lines 35-41 the use of a voice synthesizer for the audible instruction generator.

As for claims 5-8 and 21, **Slavin** discloses the claimed invention except for a memory for storing digital data and a switch connected with the sound wave generator, the test tone generator, and the processor and wherein the switch is controlled by the processor to selectively cause either the sound wave generator or the test tone generator to output sound waves. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a memory for storing digital data as such is inherent in the use of a voice synthesizer and **Slavin** clearly discloses at column 2 lines 35-41 the use of a voice synthesizer for the audible instruction generator. It would have also been obvious to one having ordinary skill in the art at the time the invention was made to utilize a switch in addition to the CPU disclosed, since it has been held that it is not an inventive step to make that which was integral into various elements and the CPU disclosed by **Slavin** controls the output of the tone generator and the audible instruction generator and controls the switching as necessary.

As for claim 9, **Slavin** discloses the claimed invention except for the switch being connected with the earphone speakers, between the sound wave generator and the test tone generator, on the one hand, and the earphone speakers, on the other hand. discloses the claimed invention except for . It would have been an obvious matter of design choice to place the switch between the sound wave generator and the test tone generator, on the one hand, and the earphone speakers, on the other hand, since applicant has not disclosed that placing the switch between the sound wave generator and the test tone generator, on the one hand, and the earphone speakers, on the other hand solves any stated problem or is for any particular purpose and it appears that the invention would perform equally well

with the switch between the CPU,on the one hand, and the sound wave generator and the test tone generator, on the other hand.

As for claim 10, **Slavin** discloses the claimed invention except for the use of a talkover card. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a talkover card since it was known in the art that conventional audiometer testers had the option of including a talkover card which allowed the test operator to instruct the subject on how to perform the test (disclosed by Applicant on page 10 lines 15 page 11 line 5 as part of the prior art).

As for claims 11-12, **Slavin** discloses the claimed invention except for a digital data storage for storing a digital data, a multimedia convertor for converting the digital data to an analog signal, and a sound wave generator for producing sound waves representative of the analog signal. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a digital data storage for storing a digital data, a multimedia convertor for converting the digital data to an analog signal, and a sound wave generator for producing sound waves representative of the analog signal as such is inherent in the use of a voice synthesizer and **Slavin** clearly discloses at column 2 lines 35-41 the use of a voice synthesizer for the audible instruction generator.

As for claim 13, **Slavin** discloses the claimed invention except for a switch for switching the output generator between the analog test tone generator and the sound wave generator. It would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a switch for switching the output generator between the analog test tone generator and the sound wave generator in addition to the CPU disclosed, since it has been held that it is not an inventive step to make that which was integral into various elements and the CPU disclosed by **Slavin** controls the output of the tone generator and the audible instruction generator.

### *Conclusion*

11. The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.

**Götze (US 4,476,724)** discloses an automatic audiometer which can be battery operated.

**Meyer-Bisch** discloses an apparatus for measuring the sensitivity of a subject to the perception of a vibration, specifically a vibration within the audible range.

**Shennib et al. (US 5,645,074)** discloses an intracanal prosthesis for hearing evaluation.

12. Any inquiry concerning this communication or earlier communications from the examiner should be directed to Rose Miller whose telephone number is (703) 305-4923. The Examiner can normally be reached on Monday-Friday from 9:30 a.m. to 5:30 p.m.

If attempts to reach the examiner by telephone are unsuccessful, the Examiner's supervisor, Hezron Williams can be reached on (703) 305-4705.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 305-4900.

RMM
August 16, 1997

HEZRON E. WILLIAMS
SUPERVISORY PATENT EXAMINER
GROUP 2200

The drawings submitted with this application were declared informal by the applicant. Accordingly they have not been reviewed by a draftsperson at this time. When formal drawings are submitted, the draftsperson will perform a review.

Direct any inquires concerning drawing review the Drawing Review Branch (703) 305-8404.

FORM PTO-892 (REV. 2-92)

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

NOTICE OF REFERENCES CITED

| SERIAL NO. | GROUP ART UNIT | ATTACHMENT TO PAPER NUMBER |
|---|---|---|
| 639,694 | 2212 | 6 |

APPLICANT(S): Braun et al.

U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | 4476724 | 10/1984 | Götze | 73 | 585 | |
| | B | 4847763 | 7/1989 | Moser et al. | 128 | 746 | |
| | C | 5239872 | 8/1993 | Meyer-Bisch | 73 | 585 | |
| | D | 5645074 | 7/1997 | Shennib et al. | 128 | 746 | 8/17/1994 |
| | E | | | | | | |
| | F | | | | | | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

R

S

T

U

EXAMINER: Rose Miller DATE: 8/16/97

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)