UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **Bernafon, Inc.** | ) | **Civil Action No. 02-777CV (JNE/JGL)** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| **Benson Medical Instruments Company** | ) | |
| **Defendant.** | ) | |

**BERNAFON INC.'S CLAIM CONSTRUCTION MEMORANDUM FOR U.S. PATENT NUMBER 5,811,681**

David R. Fairbairn (No. 28,125)
Michael J. Pape (No. 26,989X)
Dina M. Khaled (No. 284,968)
KINNEY & LANGE, P.A.
312 South Third Street
Minneapolis, Minnesota 55415
(612) 339-1863

**ATTORNEYS FOR PLAINTIFF BERNAFON, INC.**

**TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . i

TABLE OF AUTHORITIES . . . . . iv

INTRODUCTION . . . . . 1

BACKGROUND – U.S. PATENT NUMBER 5,811,681 . . . . . 1

A. The Specification. . . . . . 1

B. The Prior Art of Record. . . . . . 5

C. The Prosecution History. . . . . . 7

ARGUMENT . . . . . 8

A. Legal Standard for Claim Construction. . . . . . 8

B. Claim 4. . . . . . 9

1. A *Multimedia Audiometer* is an Instrument for Measuring Hearing that is Capable of Intelligently and Automatically Delivering Computer-Generated Corrective Instructions Upon the Occurrence of a Test Subject Error. . . . . . 9

2. A *Conventional Audiometer* is a Device Having Both Microprocessor and Audio Circuitry For Administering a Hearing Test. . . . . . 11

3. A *Computer* is a Personal Computer, Another Type of Computer, or Some Other Processing and Storage Device Having Multimedia Capabilities. . . . . 13

4. *Means for Outputting Sound Signals Generated From Digital Information of the Computer*. . . . . . 13

a. The Function of this Element is Outputting Analog Signals Representative of Voice Instructions and/or Messages. . . . . . 14

b. The Structures Disclosed For Performing this Function Are: 1.) a Computer; 2.) a Sound Wave Generator; 3.) a Multimedia Converter; 4.) a Multimedia Output Port of Computer (102), Multimedia Input Interface (110), Multimedia Talk over Card (118b), and Earphone Jack (48); or 5.) a Sound Card of Computer (102), Multimedia Input Interface (110), Multimedia Talk over Card (118b), and Earphone Jack (48). . . . . . 15

5. *Pre-programmed Logic* Is Software and/or Hardware That Provides Preset Responses Dictated by the Test Subject's Inputs. . . . . . 16

6. *Means for Outputting Test Signals Generated by the Conventional Audiometer According to Pre-programmed Logic of the Conventional Audiometer*. . . . . . 17

a. The Function of this Element is Outputting Test Tones. . . . . . 17

b. The Structures Disclosed for Performing this Function are (1) a Conventional Audiometer or (2) a Device Having Both Microprocessor and Audio Circuitry for Administering a Hearing Test. . . . . . 17

7. *Means for Switching Between the Means for Outputting Sound Signals and the Means for Outputting Test Signals*. . . . . . 18

a. The Function of this Element is Alternately Enabling the Means for Outputting Sound Signals and the Means for Outputting Test Signals to Output an Audible Sound. . . . . . 18

b. The Structures Disclosed for Performing this Function are 1.) Talkover Card (118b) or 2.) Relays (64a and 64b) and Switches (66a and 66b). . . . . . 19

8. *Means for Controlling the Means for Switching*. . . . . . 20

a. The Function of this Element is Intelligently and Automatically Directing the Means for Switching to Enable the Means For Outputting Sound Signals to Output Voice Instructions and/or Messages Upon the Occurrence of a Test Subject Error. . . . . . 20

b. The Structure Disclosed for Performing this Function is Computer (102). . . . . . 21

C. Claim 6. . . . . . 22

1. An *Audiometer* is an Instrument For Measuring Hearing. . . . . . 22

2. A *Sound Wave Generator* is a Device for Generating Longitudinal Pressure Waves of Audible or Inaudible Sound, Including Analog Signals Representative of Voice Instructions and/or Messages. . . . . . 22

3. *Test Signal Generator* is a Device for Generating Test Tones. . . . . . 23

4. The *Logic Circuit Connected with the Test Signal Generator and the Processor* Is Hardware And/or Software For Alternately Enabling Either the Sound Wave Generator or the Test Signal Generator to Output Discernible Signals. . . . . . 23

5. The *Wherein* Clause Requires the Processor to Intelligently and Automatically Adjust the Logic Circuit to Deliver Either Test Tones or, Following the Occurrence of a Test Subject Error, Computer-Generated Corrective Instructions. . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

CASES:

*Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*,
15 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . 9

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed.Cir. 2002) . . . . . . . . . . . . . . . . . . . . 8

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l*,
222 F.3d 951 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . 8, 9

*Johnson Worldwide Assocs. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . 8

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc),
*aff'd*, 116 S. Ct. 1384 (1996) . . . . . . . . . . . . . . . . . . . . 8

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
194 F.3d 1250(Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . 14

*Renishaw PLC v. Marposs Societa' Per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . 9

*Smiths Indus. Med. Sys., Inc. v. Vital Signas,* Inc.,
183 F.3d 1347 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . 14

*Texas Digital Sys., Inc. v. Telegenix Inc.*,
308 F.3d 1193 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . 8

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . 8

STATUTES:

35 U.S.C. §112. . . . . . . . . . . . . . . . . . . . . . 8

35 U.S.C. § 112, ¶ 6 . . . . . . . . . . . . . . . . . . . . 13, 17, 18, 20

35 U.S.C. §271(a). . . . . . . . . . . . . . . . . . . . . . 8

## INTRODUCTION

U.S. Patent No. 5,811,681 ("the '681 patent") relates to the field of audiometers, which are devices used to measure or test an individual's hearing capability by presenting tones of various normally audible frequencies. More specifically, the '681 patent is directed to an automatic audiometer device that does not require human test administrator intervention to: (a) automatically identify an error made by the test subject during the administration of an audiometric test, (b) automatically provide to the test subject a corrective instruction appropriate to address the identified error, and then (c) automatically resume the audiometric test.

The invention of the '681 patent was a substantial departure from the prior art, in which the administration of an hearing test was performed almost wholly by human test administrators. The inventors of the '681 patent were the first to create a system that could minimize human test administrator intervention by intelligently and automatically delivering corrective instructions upon the occurrence of a test subject error. These automatic error instructions help clarify the test procedure, dramatically increase test consistency, and reduce test administration time.

## BACKGROUND – U.S. PATENT NUMBER 5,811,681

### A. The Specification.

For several decades, hearing testing has been performed using an audiometer. (Ex. A, '681 patent at 1:37-38)[1]. In a typical audiometer testing process, a test tone of a specific frequency and volume is presented, generally through earphone speakers, to an individual test subject. (Ex. A at 5:52-57). The test subject acknowledges that the test tone was heard by pressing a hand switch.

[1] All Exhibits identified herein are attached to the Declaration of Dina M. Khaled in Support of Bernafon's Claim Construction Memorandum for U.S. Patent Number 5,811,681. Citations to patents are represented as C:L, where C is the column number and L is the line number.

(Ex. A at 5:57-62). The audiometer evaluates the response from the hand switch to determine whether that specific tone was heard by the test subject. (Ex. A at 5:57-62).

At the time of filing of the '681 patent, a conventional, or prior art, audiometer was defined as a device having microprocessor circuitry, audio circuitry, and certain optional elements for conducting a hearing test. (Ex. A at 4:37-39). During the testing process, human test subjects often make mistakes; for instance, the test subject may press the hand switch even though no test tone had been presented, the test subject may press but not release the hand switch, or the test subject may repeatedly press the hand switch when a single test tone is presented. (Ex. A at 11:3-39). A major shortcoming of conventional audiometers is that the correction of these types of errors required a human test administrator to manually determine when an error had occurred and which instruction was an appropriate response to the error, interrupt the testing process to instruct the test subject on the proper test protocol, and then restart the test. (Ex. A at 6:30-67).

The '681 patent is entitled "A Multimedia Feature for Diagnostic Instrumentation." The specification further instructs that the claimed invention:

> …relates to a multimedia interface of a diagnostic test instrument and, more particularly, to automated testing, including multimedia-derived instructions, test monitoring, and error response, by an audiometer or other medical device or diagnostic test instrument.

(Ex. A at 1:5-10). Thus, the invention of the '681 patent is an audiometer system that is "smarter" than prior art audiometers. Unlike prior art audiometers, it is the patented audiometer system itself, rather than a human test administrator, that determines when it is appropriate to switch from presenting tones to outputting verbal corrective instructions. (Ex. A at 2:45-49). More specifically, it is the patented audiometer system itself that determines whether an error has occurred during the

presentation of tones, provides an appropriate corrective instruction upon detection of an error, and restarts or resumes the test. (Ex. A at 1:5-10).

A preferred embodiment of the patented invention enables multimedia instructions to be provided to a test subject via a set of headphones by connecting a computer with multimedia capabilities to a conventional audiometer. (Ex. A at 7:13-41). To enable this conversion, the conventional audiometer is modified to include a multimedia interface through which digital voice instructions can be received from the computer. (Ex. A at 7:37-41). This modified conventional audiometer is referred to as a "basic audiometer". *Id*.

In this embodiment, the computer, rather than a human test administrator, controls the operation of the basic audiometer. (Ex. A at 10:5-7). In administering a hearing test, the computer causes the audiometer to generate test tones for delivery to the test subject. (Ex. A at 10: 35-45). The basic audiometer and the computer then work together to determine whether errors exist in any of the test subject's responses to the test tones. (Ex. A at 10:53-55). This process of presenting a tone, receiving a response, and evaluating that response is defined by the patents in suit as a test protocol. (Ex. A at 3:19-22). A complete hearing test is conducted by presenting a series of test protocols to the test subject to identify a test subject's hearing threshold at different frequencies.[2]

If the basic audiometer determines that no error occurred, the test subject may be presented with additional test protocols, or tones. (Ex. A at 10:56-59). If the basic audiometer determines that an error occurred, it communicates this determination to the computer, which then determines how

[2] A common hearing test is the Hughson-Westlake standardized procedure. In implementing Hughson-Westlake, test tones of various frequencies and volumes are presented to establish thresholds at each frequency. The threshold is the volume of a particular frequency test tone below which the test subject cannot hear.

to proceed given the nature of the error and the computer's programmed logic. (Ex. A at Figure 7, 10:65-11:1). If the error is minor, the computer may decide to continue on with the test without providing corrective instructions. *Id*. On the other hand, if the computer decides a corrective instruction is required, the computer will control the basic audiometer to provide the appropriate corrective instruction to the test subject. *Id*. Typical errors that may occur include failure to establish a threshold, improper use of the hand switch, failure to respond to a test tone, and response when no test tone is present. (Ex. A at 11:2-40). The corrective instructions are derived from digital data stored or generated in, or read by, the computer. (Ex. A at 10:20-22). The corrective instructions may be sound (verbal instructions), graphic (visual instructions), or other type of information derived from digital data. (Ex. A at 10:27-34).

The '681 patent teaches that "many possible variations and alternatives in the configuration of the computer 102 and the basic audiometer 200" exist. (Ex. A at 12:53-55). For instance, the basic audiometer could be beefed up to include additional memory, processing, wave sound generation, and appropriate software. (Ex. A at 12:53-57). Alternatively, the computer could be beefed up to include test tone generation means and software to perform the functions of the conventional audiometer. (Ex. A at 12:57-60). The patents further teach that:

> Other alternatives may be possible, it being understood that those skilled in the art will generally know and appreciate that the employment of computer or other control of instrumentation operations during test administration and the use of multimedia features for instructions, messages, and other herebefore required human administrative actions is possible with the incorporation of digital data, according to embodiments of the present invention, from which are derived multimedia features.

(Ex. A at 12:63-13:5).

In sum, the invention of the patent in suit is an audiometer that eliminates the need for a

human test administrator by automatically identifying errors and automatically providing appropriate corrective instructions.

**B. The Prior Art of Record.**

In examining the claimed invention, the Patent Office identified Moser et al., U.S. Patent No. 4,847, 763 ("Moser") (Ex. B); Slavin, U.S. Patent No. 4,489,610 ("Slavin") (Ex. C); and Delisle et al., U.S. Patent No. 3,809,811 ("Delisle") (Ex. D) as being the most pertinent.

Moser teaches "interactive audiometric test systems adapted to selectively generate audiologic hearing test signals." (Ex. B. at 1:8-11). The Moser audiometer is capable of presenting both test tones and discrete words of speech, either with or without background noise. (Ex. B at 1:14-34, 3:15-22). The test tones and discrete words of speech, or digital signals, are stored on a compact disc or video disc for subsequent access by the computer of the audiometer. (Ex. B at 2:63-68). The audiometer includes "a digital signal processor connected to one disc player and adapted to control said disc player to read-out selected digital signals in response to an operator's manual commands or, if desired, in accordance with a predetermined program." (Ex. B at 2:68-3:5). Moser specifies that a key advantage of its patented audiometer is that it enables "the examiner to put his full attention to the examinee due to the easy operation of the new audiometer system allowing for quick and exact selection of any one of a nmber (sic) of available test signals recorded on the disc." (Ex. B at 3:25-30). A human operator, or examiner, monitors the responses received from the test subject during the hearing test. (Ex. B at 7:41-8:3).

Slavin teaches a computerized audiometer for testing the hearing of an individual and for generating programming for a programmable hearing aid. (Ex. C at 1:5-10). The Slavin audiometer includes a tone generator for applying a predetermined sequence of tones of varying frequency and

amplification to a head set under the control of a central processing unit. (Ex. C at 1:42-51). The Slavin audiometer also includes an audible instruction generator for providing "an automatic sequence of spoken instructions to the person being tested." (Ex. C at 1:51-54). The audible instructions are stored on a continuously cyclable tape, record player, or voice synthesizer in an predetermined sequence. (Ex. C at 1:51-54, 2:34-43). The audible instructions include pauses placed between the instructions to allow for the presentation of test tones between the instructions. (Ex. C at 2:34-43). Importantly, the audible instruction generator must be synchronized with the tone generator to allow for a so-called "automatic" test environment. (Ex. C at 2:34-43). An operator supervises the administration of the test to ensure the responses received from the test subject are proper. (Ex. C at 3:48-63).

Delisle teaches a basic audiometer for automatically administering a hearing test. (Ex. D at 1:1-7). The Delisle audiometer includes a tape player operating under the control of a computer. (Ex. D at 2:12-47). The audiometric test of Delisle involves three stages: (1) a pre-test stage in which a pre-determined sequence of instructions is provided to the test subject and a short test is administered to determine whether the test subject is able to receive the test; (2) a vocal test stage in which a pre-determined series of recorded words is provided to the test subject; and (3) a pure tone test stage in which a series of tones is presented to the test subject. (Ex. D at 3:48-4:16). To enable the audiometer to proceed through these three stages, voice instructions and a series of words are pre-recorded onto an endless tape for sequential play. (Ex. D at 3:17-20).

None of Moser, Slavin, or Delisle teaches a method for automatically identifying an error made by the test subject during administration of an audiometric test. Nor do any of these references teach a method for automatically providing appropriate corrective instructions to the test subject.

**C. The Prosecution History.**

The '681 patent was filed on April 29, 1996 as U.S. Patent Application No. 08/639,694 ("the '694 application") with claims 1-22. (Ex. E). On August 25, 1997, the Patent Office issued an Office Action rejecting all twenty-two claims. (Ex. F). Although this rejection was disagreed with (evidenced by the fact that a continuation application containing claims identical to the initially rejected claims was later filed), an Amendment dated February 25, 1998 (the "2/25/98 Amendment") was filed amending each of the independent claims. (Ex. G).

In the 2/25/98 Amendment, it was noted that the Moser, Slavin, and Delisle audiometers are each essentially a "conventional audiometer", or, in other words, a dumb sound source (audio circuitry) along with a computer (microprocessor circuitry). (Ex. G at 8, 10-11). The claimed invention was distinguished from these references by highlighting a novel feature of the claimed invention – the addition of multimedia functions via an additional computer that each of these references lack. (Ex. G at 9-11). In emphasizing this distinction, it was argued:

> This is an essence and tremendous advantage of Applicant's claimed invention. Applicants can use a conventional audiometer, add a computer with multimedia operations, and achieve an entirely or substantially automated audiometric testing environment. The conventional audiometer has certain, but limited, logical functions during the testing procedure. These logical functions provide certain pre-programmed responses dictated by the test subject's inputs. In the event of certain errors or other occurrences in testing operation of the conventional audiometer, the audiometer has limited or no logical response and testing can be undesirably halted. (In such instances in testing with conventional audiometers, operator intervention is required at this point to correct the problems) (sic) and re-initiate the test. By addition of the computer, in conjunction with the audiometer, for testing, the computer can, through desired programming, provide logical results for virtually every error or occurrence.

(Ex. G at 9).

## ARGUMENT

### A. Legal Standard for Claim Construction.

Patents allow inventors a limited-duration right to exclude others from making, using, and selling the patented invention. 35 U.S.C. §271(a). Patent claims, which define the scope of that right to exclude, must particularly point out and distinctly claim the subject matter which the applicant regards as his invention. 35 U.S.C. §112. Therefore, it is statutorily required that competitors be able to ascertain to a reasonable degree the scope of a patent's protection. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc), *aff'd*, 116 S. Ct. 1384, 1396 (1996). In addition, it is well settled that, as a matter of law, courts interpret the claims of the patent which define the scope of patent protection. *Id.* at 970-71.

As a starting point, the Court begins with the claim language itself and gives claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 955 (Fed. Cir. 2000). There is a "heavy presumption in favor of the ordinary meaning of claim language." *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). To help inform the court of the ordinary meaning of the words, the court may consult a dictionary, encyclopedia, or treatise. *Texas Digital Sys., Inc. v. Telegenix Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).

Despite this presumption, "a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from the prior art on a basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed.Cir. 2002).

Thus, the Court must always examine the specification to determine whether the patentee acted as a lexicographer and ascribed a different or modified meaning to the term. *Hockerson-Halberstadt*, 222 F.3d at 955. But, absent an express intent to impart a novel meaning in the specification or prosecution history, "terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1577 (Fed. Cir. 1993).

**B. Claim 4.**

The parties have agreed to limit analysis to representative independent claims 4 and 6 of the '681 patent. Following is the text of claim 4 with the terms identified by one or the other of the parties as requiring construction identified in boldface:

> A **multimedia audiometer**, including a **conventional audiometer** and a **computer**, comprising:
>
> **means for outputting sound signals** generated from digital information of the computer;
>
> **means for outputting test signals** generated by the conventional audiometer according to **pre-programmed logic** of the conventional audiometer;
>
> **means for switching** between the means for outputting sound signals and the means for outputting test signals, the means for switching being communicatingly connected with the means for outputting sound signals and the means for outputting test signals; and
>
> **means for controlling** the means for switching, the means for controlling being communicatingly connected with the means for switching.

(Ex. A at 13:44-59)(Emphasis added). Each of these identified terms is addressed below.

**1. A *Multimedia Audiometer* is an Instrument for Measuring Hearing that is Capable of Intelligently and Automatically Delivering Computer-Generated Corrective Instructions Upon the Occurrence of a Test Subject Error.**

The invention of claim 4 is identified in the preamble as a *multimedia audiometer*. The first step in construing the term *multimedia audiometer* is to ascertain its plain and ordinary meaning.

The term *audiometer* is defined simply as: "An instrument for measuring hearing activity for pure tones of normally audible frequencies." (Khaled Decl., ¶ 9).[3] In the computing industry, the term *multimedia* is often used to connote the addition of sound card or similar capabilities to a computer. (Khaled Decl., ¶¶ 10-11).

The next step in this construction is to look to the specification to determine how the '681 patent uses the term *multimedia audiometer*. The '681 patent explains that the primary shortcoming of prior art audiometers was their need for a human test administrator to supervise the audiometric testing process in order to personally provide corrective voice instructions when a test subject erred in responding to the presentation of test tones. (Ex. A at 1:31-36, 2:13-15, 6:38-45). The specification goes on to explain that the invention of the '681 patent overcomes this shortcoming by providing "*multimedia* automation" to the testing process. (Ex A at 2:33-41). The specification explains that this *multimedia* automation includes monitoring the hearing test for test subject errors and then automatically responding to the error by providing the test subject with appropriate *multimedia*-derived instructions. (Ex. A at 1:5-10, 2:33-35, 7:37-41). In a preferred embodiment, these *multimedia*-derived instructions are generated through use of a sound card. (Ex. A at 7:49-56). Thus, as used in the '681 patent, the term *multimedia* relates to the intelligent and automatic presentation of computer-generated corrective instructions upon the occurrence of test subject errors.

This definition is consistent with the plain and ordinary usage of *multimedia* in computing applications. The invention adds a computer with *multimedia* capabilities (such as a sound card) to intelligently generate appropriate corrective instructions to the test subject. This definition is further

---

[3] Unless otherwise specified, all dictionary definitions are taken from *The American Heritage® Dictionary of the English Language*, 3rd Ed. (1996), and the full text of the definition is provided in the Khaled Decl.

consistent with the usage of the term *multimedia* during prosecution of the '681 patent. In responding to an Office Action issued by the Patent Office, Bernafon again emphasized that the primary aspect of the claimed invention was the ability to automatically conduct a hearing test without the need for human test administrator intervention during the testing process:

> This additional computer allows **multimedia** functions to be added to the conventional audiometer.
>
> This is an essence and tremendous advantage of Applicants' claimed invention. Applicants can use a conventional audiometer, add a computer with **multimedia** operations, and achieve an entirely or substantially **automated** testing environment.

(Ex. G at 9)(emphasis added). Thus, as used in the '681 patent, a *multimedia audiometer* is an audiometer, or instrument for measuring hearing, that is capable of intelligently and automatically presenting computer-generated corrective instructions upon the occurrence of test subject errors.

**2. A *Conventional Audiometer* is a Device Having Both Microprocessor and Audio Circuitry For Administering a Hearing Test.**

The preamble of claim 4 identifies that the claimed multimedia audiometer includes a *conventional audiometer* that generates test signals according to a pre-programmed logic. As described below, pre-programmed logic is the software or hardware that provides preset responses dictated by the test subject's input.

We next consult a dictionary to determine the plain and ordinary meaning of the terms *conventional* and *audiometer*. *Audiometer* is a noun defined as "An instrument for measuring hearing activity for pure tones of normally audible frequencies." (Khaled Decl., ¶ 9). *Conventional* is a adjective defined as "Based on or in accordance with general agreement, use, or practice; customary: *conventional symbols*; *a conventional form of address*." (Khaled Decl., ¶ 12). What is "customary" will vary over time, so the dictionary definition of *conventional audiometer* is a device

customary at the time for measuring hearing, or an audiometer conforming to accepted standards.

Next, the '681 patent specification is consulted to determine how the term *conventional audiometer* is used therein. The specification explains that the invention of the '681 patent is a *conventional audiometer* that has been modified to eliminate the need for a human operator to administer a hearing test. (Ex. A at 1: 5-9, 7:1-15). Placing the term *conventional audiometer* in context of the invention of the '681 patent, it is apparent that the invention of the '681 patent is not based on any specific configuration of a *conventional audiometer*. (Ex. A at 4:27-34, 42-48). In fact, the '681 patent itself defines the term *conventional audiometer* to be a device for administering a hearing test comprising microprocessor circuitry, audio circuitry and certain optional elements. (Ex. A at 4:37-39). This definition of *conventional audiometer* is consistent with the dictionary definition, and merely defines what, at the time of filing of the '681 patent, was a customary device for measuring hearing activity for pure tones of normally audible frequencies. Thus, in the context of the '681 patent, a *conventional audiometer* is "a device having both microprocessor and audio circuitry for administering a hearing test."

The prosecution history reinforces this definition as accurate. In the 2/25/98 Amendment, the claimed invention was distinguished from the devices taught by Moser, Slavin, and Delisle by noting that each of these devices is analogous to the *conventional audiometer* of the '681 patent – which is essentially, a computer (microprocessor circuitry) and a dumb sound source (a sound source with no logical capabilities itself, or audio circuitry). (Ex. G at 8-11). Specifically, the Moser audiometer was noted to be a computer and a dumb sound source (a CD player), the Slavin audiometer a computer with two dumb sound sources (a tone generator and a audible instruction generator), and the Delisle audiometer is a computer and a dumb sound source (a tape player). *Id.*

Because the definition of *conventional audiometer* as being "a device having both microprocessor and audio circuitry for administering a hearing test" is consistent with all of the intrinsic evidence, it is the proper construction.

**3. A *Computer* is a Personal Computer, Another Type of Computer, or Some Other Processing and Storage Device Having Multimedia Capabilities.**

The plain and ordinary meaning of the term *computer* is "[a] device that computes, especially a programmable electronic machine that performs high-speed mathematical or logical operations or that assembles, stores, correlates, or otherwise processes information." (Khaled Decl., ¶ 13). This definition is consistent with use of the term *computer* in the '681 patent, which further defines *computer* to be "a personal computer, another type of computer, or some other processing and storage device" having "multimedia capabilities, that is, the computer 102 should be capable of producing sound waves and/or visual images from representative digital information stored, generated, and/or manipulated within or by the computer 102." (Ex. A at 7:15-27). This definition is further consistent with the language of claim 4 itself, which informs that the *computer* must include digital information from which sound signals may be generated. Nothing in the prosecution history imparts any different meaning on the term *computer*.

***4. Means for Outputting Sound Signals Generated From Digital Information of the Computer.***

This element is written in means-plus-function language in conformity with 35 U.S.C. § 112, ¶ 6, which recites that:

> An element in a claim for a combination may be expressed as a means or a step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim [element] shall be construed to cover the corresponding structure or acts described in the specification and equivalents thereof.

Construction of a means-plus-function element begins with a determination of the meaning of the specified function. *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Once the function is construed, the specification must be consulted to identify the corresponding structure described therein for performing the claimed function. *Smiths Indus. Med. Sys., Inc. v. Vital Signas,* Inc., 183 F.3d 1347, 1358 (Fed. Cir. 1999).

**a. The Function of this Element is Outputting Analog Signals Representative of Voice Instructions and/or Messages.**

The specified function of this element is *outputting sound signals generated from digital information of the computer*. A *sound signal* is a generally audible analog signal. (*See* Khaled Decl., ¶¶ 14-15). Claim 4, however, itself limits this definition to only those *sound signals* that are *generated from digital information of the computer*. Looking to the '681 patent specification, it is explained that *sound signals generated from digital information of the computer* are analog signals representative of voice instructions and/or messages. (Ex. A at 10:20-27, 11:5-11, 12:38-41).

Claim 4 distinguishes the claimed *sound signals* from "test signals generated by the conventional audiometer". Again the specification reinforces that the *sound signals* should be construed as analog signals representative of voice instructions and/or messages. The claimed invention is a multimedia audiometer capable of switching the sounds heard by the test subject during the testing process between the test signals generated by the conventional audiometer and analog signals representative of voice instructions and/or messages. (*See* Ex. A at 10:5-12:18). For instance, if the computer determines that the test subject erred in responding to a test tone, the computer may decide to provide the test subject a corrective instruction by switching the sound output from test tones to analog voice instructions. Once the corrective instructions have been

conveyed, the hearing test may be resumed with the presentation of a test tone. *Id*.

Nothing in the prosecution history imparts any different meaning on the term *sound signals*. Accordingly, the function of this element is "outputting analog signals representative of voice instructions and/or messages".

**b. The Structures Disclosed For Performing this Function Are: 1.) a Computer; 2.) a Sound Wave Generator; 3.) a Multimedia Converter; 4.) a Multimedia Output Port of Computer (102), Multimedia Input Interface (110), Multimedia Talk over Card (118b), and Earphone Jack (48); or 5.) a Sound Card of Computer (102), Multimedia Input Interface (110), Multimedia Talk over Card (118b), and Earphone Jack (48).**

The '681 patent lists a variety of structures for outputting analog signals representative of voice instructions and/or messages. In several embodiments of the claimed invention described in the summary of the invention, the '681 patent teaches a computer (Ex. A at 3:4-6), a sound wave generator (Ex. A at 3:8-17), or a multimedia converter (Ex. A at 3:22-31) for performing the function of outputting analog signals representative of voice instructions and/or messages.

In the preferred embodiment of the claimed invention, digital data is converted into analog signals by computer (102). (Ex. A at 7:24-28). Specifically, the analog signals travel from a multimedia output port of computer (102) to multimedia talkover card (118b) via multimedia input interface (110). (Ex. A at 7:49-53). From multimedia talkover card (118b), the analog signals then travel to earphone jack (48) for output to the test subject. (Ex. A at Figure 5). The '681 patent further discloses that the multimedia output port of computer (102) may be a sound card. (Ex. A at 7:53-56). Thus, in this preferred embodiment, the equivalent structure is composed of computer (102) having a multimedia output port (or computer (102) having a sound card), multimedia input interface (110), multimedia talkover card (118b), and earphone jack (48).

In sum, the structures disclosed for performing the function of *outputting sound signals* are: 1.) a computer; 2.) a sound wave generator; 3.) a multimedia converter; 4.) a multimedia output port of computer (102), multimedia input interface (110), multimedia talk over card (118b), and earphone jack (48); or 5.) a sound card of computer (102), multimedia input interface (110), multimedia talk over card (118b), and earphone jack (48).

**5. *Pre-programmed Logic* Is Software and/or Hardware That Provides Preset Responses Dictated by the Test Subject's Inputs.**

*Preprogram* is a verb defined as: "To program in advance; preset." (Khaled Decl., ¶ 16). In computer science, *logic* is a noun defined as:

a. The nonarithmetic operations performed by a computer, such as sorting, comparing, and matching, that involve yes-no decisions.
b. Computer circuitry.
c. Graphic representation of computer circuitry.

(Khaled Decl., ¶ 17). Thus, *pre-programmed logic* is computer source code ("software") programmed into a device and/or computer circuitry ("hardware") for performing a specified function.

The term *pre-programmed logic* was added to claim 4 (numbered as claim 3 during prosecution of the '681 patent) via the 2/25/98 Amendment submitted during the prosecution of the '681 patent. (Ex. G at 2). Accordingly, the remarks accompanying that Amendment clarify the intended meaning of the term *pre-programmed logic*:

> The conventional audiometer has certain, but limited, logical functions during the testing procedure. **These logical functions provide certain pre-programmed responses dictated by the test subject's inputs.**

(Ex. G at 9) (Emphasis added). These are logical capabilities that did not exist in the dumb sound sources of the cited prior art. Thus, the specified function associated with the *pre-programmed logic*

is the ability to provide certain pre-programmed responses dictated by the test subject's inputs. The *pre-programmed logic* must be construed to be the software and/or hardware that provides preset responses dictated by the test subject's inputs.

### 6. *Means for Outputting Test Signals Generated by the Conventional Audiometer According to Pre-programmed Logic of the Conventional Audiometer.*

The element is written in means-plus-function language in conformity with 35 U.S.C. § 112, ¶ 6. Accordingly, the function must first be construed, and then the specification is consulted to ascertain the structures disclosed therein for performing the construed function.

#### a. The Function of this Element is Outputting Test Tones.

The specified function of this element is *outputting test signals generated by the conventional audiometer according to pre-programmed logic of the conventional audiometer*. In the context of the invention of claim 4, it is clear that the term *test signals* refers to test tones. (*See* Khaled Decl., ¶¶ 15, 18). The conventional audiometer was construed above as "a device having both microprocessor and audio circuitry for administering a hearing test", while the pre-programmed logic was construed as "the software and/or hardware that provides preset responses dictated by the test subject's inputs." The '681 patent teaches that a conventional audiometer generates test tones for evaluation of hearing. (Ex A at 1:12-13, 5:13-24). Thus, the intrinsic evidence makes clear that the *test signals* are test tones, and the function of this element is outputting test tones.

#### b. The Structures Disclosed for Performing this Function are (1) a Conventional Audiometer or (2) a Device Having Both Microprocessor and Audio Circuitry for Administering a Hearing Test.

The '681 patent teaches that it is conventional audiometer (2), defined as a device having both microprocessor circuitry (4) and audio circuitry (6) for administering a hearing test, that outputs test

tones. (Ex. A at 4:37-5:62). Test tones generated by audio circuitry (6) of conventional audiometer (2) are output to the test subject via earphone jack (48) of conventional audiometer (2). (Ex. A at 4:37-5:62, Figure 5, 8:17-20). Thus, the corresponding structures are: (1) a conventional audiometer; or (2) a device having both microprocessor and audio circuitry for administering a hearing test.

### 7. *Means for Switching Between the Means for Outputting Sound Signals and the Means for Outputting Test Signals.*

This element is written in means-plus-function language in conformity with 35 U.S.C. § 112, ¶ 6. Accordingly, the function must first be construed, and then the specification is consulted to ascertain the structures disclosed therein for performing the construed function.

#### a. The Function of this Element is Alternately Enabling the Means for Outputting Sound Signals and the Means for Outputting Test Signals to Output an Audible Sound.

The specified function of this element is "*switching* between the means for outputting sound signals and the means for outputting test signals". The means for outputting sound signals and the means for outputting test signals were construed above, leaving only the language *switching between* to be defined in construing the scope of the claimed function.

Here, the plain language of claim 4 makes clear that a single structure is not merely *switched* on or off; but rather that the *switching* occurs *between* the means for outputting sound signals and the means for outputting test signals. In this context, the term *switching* carries the connotation of: "to exchange". (Khaled Decl., ¶ 19). The specification of the '681 patent explains that the claimed multimedia audiometer outputs either sound signals or test signals to the test subject, but not both simultaneously. (Ex. A at 6:55-58). To output only one of the sound signals and test signals, the specification teaches the outputs of the means for outputting sound signals and the means for

outputting test signals are alternately enabled to output audible sounds. (Ex. A at 10:8-19 , 10:35-50). Accordingly, in the context of claim 4, the plain and ordinary meaning of the *switching between* function is to alternately enable either the means for outputting sound signals or the means for outputting test signals to output an audible sound.

**b. The Structures Disclosed for Performing this Function are 1.) Talkover Card (118b) or 2.) Relays (64a and 64b) and Switches (66a and 66b).**

The '681 patent teaches two structures for alternately connecting the means for outputting sound signals and the means for outputting test signals to the audiometer output. First, the '681 patent teaches that in the conventional audiometer (2), talkover card (8b) serves as "a switch" to switch from signals representative of test tones to signals representative of the human test administrator's instructions then being voiced. (Ex. A at 6:16-23). The '681 patent further explains that the multimedia audiometer of the present invention includes multimedia talkover card (118b), which includes many of the features of talkover card (8b), including the ability to act as a switch between signals representative of test tones and signals representative of the human test administrator's instructions then being voiced. (Ex. A at 7:56-8:20). Multimedia card (118b) also allows the signals representative of the voiced instructions to be replaced with the multimedia-derived voice instructions. (Ex. A at 8:1-17). Thus, one structure disclosed for implementing the construed function is multimedia talkover card (118b).

The '681 patent also teaches the use of relays (64a and 64b) and switches (66a and 66b) to switch between the two outputs. Specifically, to switch the output between test tones to analog signals representative of voice instructions and/or messages, computer (102) may control basic audiometer (200) to trigger relays (64a and 64b) to appropriately open or close switches (66a and

66b). (Ex. A at 10:8-19, 10:35-50).

Thus, the corresponding structures are: 1.) multimedia talkover card (118b); or 2.) relays (64a and 64b) and switches (66a and 66b).

**8. *Means for Controlling the Means for Switching.***

The element is written in means-plus-function language in conformity with 35 U.S.C. § 112, ¶ 6. Accordingly, the function must first be construed, and then the specification is consulted to ascertain the structures disclosed therein for performing the construed function.

**a. The Function of this Element is Intelligently and Automatically Directing the Means for Switching to Enable the Means For Outputting Sound Signals to Output Voice Instructions and/or Messages Upon the Occurrence of a Test Subject Error.**

The last element of claim 4 is the *means for controlling* the means for switching. The means for switching was construed above, leaving only the term *controlling* left to be construed. The dictionary definition of *control* (tr. v.) that best applies given the context of claim 4 is: "[t]o exercise authoritative or dominating influence over; direct". (*See* Khaled Decl., ¶ 20, for full definition).

As described above, the means for switching alternately connects either the output of means for outputting sound signals or the output of the means for outputting test signals to the audiometer output. The '681 patent teaches that, during the testing process, this switching does not occur randomly or arbitrarily. Rather, the crux of the '681 invention is that this switching is directed in an intelligent and automatic fashion. If it is determined that the test subject has erred, the means for switching is directed to enable the means for outputting sound signals to pass appropriate, corrective instructions on to the test subject. (Ex. A at 12:19-23, 10:8-19). Once the corrective instruction has been conveyed to the test subject, the means for switching is directed to allow the means for

outputting test signals to again output test tones. (Ex. A at 10:35-45).

In sum, as used in the '681 patent, *controlling* the means for switching involves: (a) automatically identifying an error made by the test subject during the administration of an audiometric test, (b) automatically directing the means for switching to enable a corrective instruction appropriate to address the identified error to be conveyed to the test subject, and then (c) automatically directing the switch to enable test tones to again be presented. In other words, *controlling* the means for switching requires intelligently and automatically directing the means for switching to enable the means for outputting to output voice instructions and/or messages upon the occurrence of a test subject error.

**b. The Structure Disclosed for Performing this Function is Computer (102).**

The '681 patent teaches that it is computer (102) that *controls*, or directs, the means for switching to deliver appropriate computer-generated corrective instructions upon the occurrence of a test subject error. Specifically, by way of example, the '681 patent explains that if computer (102) detects and determines (314) an error (318), then computer (102) determines (324) whether to proceed (326) with the test or whether a corrective instruction and re-test (328) is necessary. (Ex. A at 10:65-11:3). If re-test (328) is determined necessary, computer (102) *controls* (304) basic audiometer (200) to trigger relays (64a,b) to adjust the switches (66a,b) to allow voice instructions (such as those detailed in Ex. A at 11:4-40) to pass to the test subject. (Ex. A at 12:19-23, 10:8-19). Once the corrective voice instruction is conveyed (306) to the test subject, computer (102) *controls* (306) basic audiometer (200) to trigger relays (64a,b) to adjust switches (66a,b) to allow tones to be passed to the test subject. (Ex. A at 10:35-45). Thus, the structure disclosed in the specification for performing the *means for controlling* the means for switching is computer (102).

### C. Claim 6.

Claim 6 of the '681 patent recites:

An **audiometer** testing device, comprising:
a processor;
a memory, communicatingly connected with the processor, for storing digital data;
a **sound wave generator**, for generating analog sound signals in respect of digital data electrically connected with the processor;
a **test signal generator**; and
a **logic circuit connected with the test signal generator and the processor**;
**wherein the logic circuit and the sound wave generator are controlled by the processor to selectively cause either the sound wave generator or the test signal generator to output discernible signals**.

(Ex. A at 14:8-22) (Emphasis added). Each of the above boldfaced terms above was identified by one or the other of the parties as requiring construction and is addressed below.

#### 1. An *Audiometer* is an Instrument For Measuring Hearing.

The invention of claim 6 is identified as an *audiometer*. The dictionary definition of this term is: "An instrument for measuring hearing activity for pure tones of normally audible frequencies." (Khaled Decl., ¶ 9). This dictionary definition is consistent with the definition provided in the '681 patent; namely, an "audiometer is an electrically activated generator of test tones for evaluation of hearing." (Ex. A at 1:12-13). Thus, an *audiometer* is an instrument for measuring hearing.

#### 2. A *Sound Wave Generator* is a Device for Generating Longitudinal Pressure Waves of Audible or Inaudible Sound, Including Analog Signals Representative of Voice Instructions and/or Messages.

The audiometer of claim 6 includes a *sound wave generator*. Once again, construction of this term is begun by consulting the dictionary to learn that the term *sound wave* is a noun defined as "[a] longitudinal pressure wave of audible or inaudible sound." (Khaled Decl., ¶ 21). Thus the

plain and ordinary meaning of the term *sound wave generator* is a device for generating longitudinal pressure waves of audible or inaudible sound.

Looking to the claim language itself, claim 6 also instructs that the *sound wave generator* generates analog sound signals in respect of digital data electrically connected with the processor. Thus, *sound waves* must include analog sound signals. The term "sound signals" was shown above (in the context of the "means for outputting sound signals" element of claim 4) to be "analog signals representative of voice instructions and/or messages". Nothing in the '681 patent specification or prosecution history detracts from this definition of *sound wave generator*. Thus, a *sound wave generator* is a device for generating longitudinal pressure waves of audible or inaudible sound, including analog signals representative of voice instructions and/or messages.

**3. *Test Signal Generator* is a Device for Generating Test Tones.**

The plain language of the *test signal generator* itself indicates that the *test signal generator* is a device that generates test signals. (*See* Khaled Decl., ¶¶ 15, 18). The term *test signal* is defined above (in the context of the "means for outputting test signals" of claim 4) as "test tones." Thus, a *test signal generator* is a device for generating test tones.

The '681 patent specification identifies an audiometer as a "generator of test tones for evaluation of hearing." (Ex. A at 1:12-13). The '681 patent further teaches an electronic instrument that generates test tones (Ex. A at 1:42-47), and a device having both microprocessor and audio circuitry for generating test tones. (Ex. A at 4:37-39, 5:15-22). Each of these disclosed structures is consistent with the plain and ordinary meaning of this element; thus, the plain and ordinary meaning should be adopted as the construction of this element.

**4. The *Logic Circuit Connected with the Test Signal Generator and the Processor* Is**

**Hardware And/or Software For Alternately Enabling Either the Sound Wave Generator or the Test Signal Generator to Output Discernible Signals.**

Construction of the term *logic circuit* begins by consulting a dictionary. In computer science, *logic* is defined as "(a) the nonarithmetic operations performed by a computer, such as sorting, comparing, and matching, that involve yes-no decisions; (b) computer circuitry; or (c) graphic representation of computer circuitry." (Khaled Decl., ¶ 17). In electronics, *circuit* is defined as "(a) a closed path followed or capable of being followed by an electric current; (b) a configuration of electrically or electromagnetically connected components or devices." (Khaled Decl., ¶ 22). It follows that those skilled in the art would understand the claimed *logic circuit* to be the hardware and/or software used for performing a specified function.

Looking next to the context in which the *logic circuit* resides within the audiometric testing device of claim 6, it is seen that the *logic circuit* is connected with both the test signal generator and the processor, and that the *logic circuit* is controlled by the processor to selectively cause either the sound wave generator or the test signal generator to output discernible signals. Thus, the function performed by the *logic circuit* is alternately enabling either the sound wave generator or the test signal generator to output discernible signals. This is consistent with the '681 patent specification, which teaches that the claimed audiometer outputs either sound waves or test signals to the test subject, but not both simultaneously. (Ex. A at 6:55-58). Thus, the *logic circuit* is the hardware and/or software for alternately enabling either the sound wave generator or the test signal generator to output discernible signals.

5. **The *Wherein* Clause Requires the Processor to Intelligently and Automatically Adjust the Logic Circuit to Deliver Either Test Tones or, Following the Occurrence of a Test Subject Error, Computer-Generated Corrective Instructions.**

The last element of claim 6 is a *wherein* clause reciting *wherein the logic circuit and the sound wave generator are controlled by the processor to selectively cause either the sound wave generator or the test signal generator to output discernible signals*. It is first noted, that of the terms in this clause, the *logic circuit*, *sound wave generator*, and *test signal generator* were construed above. Looking to the remaining language, claim 6 requires that the *processor controls the logic circuit to selectively cause* an event. The first term requiring construction in this clause is the term *processor*. In computer science, *processor* is defined as:

> a. A computer. b. A central processing unit. c. A program that translates another program into a form acceptable by the computer being used.

(Khaled Decl., ¶ 23). Nothing in the specification or prosecution history detracts from this plain and ordinary meaning.

We next look to the phrase, *control to selectively cause*. Here, the dictionary definition of *control* that best applies given the context of claim 6 is: "[t]o exercise authoritative or dominating influence over; direct". (*See* Khaled Decl., ¶ 20, for full definition). The invention of the '681 patent is an audiometer that outputs either sound signals or test signals, but not both simultaneously. The act of switching between the output of sound signals and test signals does not occur randomly or arbitrarily. Rather, the crux of the '681 invention is that this switching is directed in an intelligent and automatic fashion. If it is determined that the test subject has erred, the *logic circuit* is directed to cause the sound signal generator to pass appropriate, corrective instructions to the test subject. (Ex. A at 12:19-23, 10:8-19). Once the corrective instruction has been conveyed to the test subject, the *logic circuit* is directed to allow the test signal generator to again output test tones. (Ex. A at 10:35-45). Thus, as used in the '681 patent, *controlled by the processor to selectively cause either*

*the sound wave generator or the test signal generator to output discernible signals* requires: (a) automatically identifying an error made by the test subject during the administration of an audiometric test, (b) automatically directing the *logic circuit* to *cause* a corrective instruction appropriate to address the identified error to be conveyed to the test subject, and then (c) automatically directing the *logic circuit* to *cause* test tones to again be presented. In other words, this *wherein clause* requires: the *processor* to intelligently and automatically direct the *logic circuit* to deliver either test tones or, following the occurrence of a test subject error, computer-generated corrective instructions.

**CONCLUSION**

Pursuant to the foregoing discussion, Bernafon respectfully requests that the court adopt its proposed construction of the disputed terms of the '681 patent. Bernafon's proposed claim construction gives proper effect to the asserted patent claim terms pursuant with the plain and ordinary meaning of the asserted claims and are faithful to the letter and spirit of the invention claimed in the '681 patent.

Respectfully submitted,

Dated: June 29, 2004

By: **s/Michael J. Pape**

David R. Fairbairn (No. 28,125)
Michael J. Pape (No. 26,989X)
Dina M. Khaled (No. 284,968)
KINNEY & LANGE, P.A.
312 South Third Street
Minneapolis, Minnesota 55415
(612) 339-1863

**ATTORNEYS FOR PLAINTIFF BERNAFON, INC.**