UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Bernafon, Inc.** <br> **Plaintiff,** <br> **v.** <br> **Benson Medical Instruments Company** <br> **Defendant.** | **Civil Action No. 02-777CV (JNE/JGL)** |

**BERNAFON, INC.'S REBUTTAL CLAIM CONSTRUCTION MEMORANDUM FOR U.S. PATENT NUMBER 5,811,681**

David R. Fairbairn (No. 28,125)
Michael J. Pape (No. 26,989X)
Dina M. Khaled (No. 284,968)
KINNEY & LANGE, P.A.
312 South Third Street
Minneapolis, Minnesota 55415
(612) 339-1863

**ATTORNEYS FOR PLAINTIFF BERNAFON, INC.**

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Benson Fails to Adhere to Proper Claim Construction Methodology . . . . . . . . . . . . . . . . 1

B. Benson Misstates the Inventive Contribution of the '681 Patent . . . . . . . . . . . . . . . . . . . . 2

C. Claim 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1. *Multimedia Audiometer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2. *Conventional Audiometer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3. *Computer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

4. *Means for Outputting Sound Signals Generated From Digital Information of the Computer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5. *Pre-programmed Logic* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6. *Means for Outputting Test Signals Generated by the Conventional Audiometer According to Pre-programmed Logic of the Conventional Audiometer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7. *Means for Switching Between the Means for Outputting Sound Signals and the Means for Outputting Test Signals* . . . . . . . . . . . . . . . . . . . . . . . . 6

8. *Means for Controlling the Means for Switching* . . . . . . . . . . . . . . . . . . . . . . . . 6

D. Claim 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1. *Audiometer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2. *Sound Wave Generator* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3. *Test Signal Generator* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4. *Logic Circuit Connected with the Test Signal Generator and the Processor.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5. The *Wherein* Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# TABLE OF AUTHORITIES

CASES:

*Digital Biometrics, Inc. v. Identix, Inc.*,
149 F.3d 1335 (Fed. Cir. 1998) . . . . . . . . . . 1

*Ishida Co. v. Taylor*,
221 F.3d 1310 (Fed. Cir. 2000) . . . . . . . . . . 2

*Johnson Worldwide Assocs. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) . . . . . . . . . . 1

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
355 F.3d 1361 (Fed. Cir. 2004) . . . . . . . . . . 1

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003) . . . . . . . . . . 1

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) . . . . . . . . . . 2

*Middleton, Inc. v. Minn. Mining & Mfg. Co.*,
311 F.3d 1384 (Fed. Cir. 2002) . . . . . . . . . . 7

*Smiths Indus. Med. Sys., Inc. v. Vital Signas, Inc.*,
183 F.3d 1347 (Fed. Cir. 1999) . . . . . . . . . . 1

*Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
805 F.2d 1558, 1563 (Fed. Cir. 1986) . . . . . . . . . . 8

## INTRODUCTION

Before the Court is a motion to construe several elements of claims 4 and 6 of the '681 patent. Bernafon, in its opening brief and herein, performs a detailed analysis of these elements and proposes constructions consistent with the ordinary meaning of the claim language and faithful to the letter and spirit of the invention. For the reasons detailed below, Bernafon respectfully requests that the court adopt its proposed construction of the disputed terms of the '681 patent.

## ARGUMENT

### A. Benson Fails to Adhere to Proper Claim Construction Methodology.

Claim construction proceeds with a examination of the claims, the written description, and the prosecution history, one after another, in a series. *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004). In this process, "[t]he actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). There is a heavy presumption in favor of the ordinary meaning of claim language. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). Despite this well-settled law, Benson removes the claim terms from their context in the claim itself and begins and ends its claim construction analysis with the prosecution history. By ignoring the accepted principles of claim construction law, Benson obtains illogical results for many of the construed elements.

In analyzing a means-plus-function element, the first step is to identify the claimed function, which is then construed to ascertain the meaning of the claim language. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). Once the language has been construed, the specification is consulted to identify all structures that perform that function. *Id* at 1320. The element is then construed to cover the corresponding structure and its equivalents. *Smiths*

*Indus. Med. Sys., Inc. v. Vital Signas,* Inc., 183 F.3d 1347, 1358 (Fed. Cir. 1999). Where alternate structures are disclosed, the element is construed to cover each of the alternate structures and their equivalents. *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000). Benson, in proposing constructions of these elements, skips the steps of identifying and construing the function, instead generally beginning its analysis with a selection of specification excerpts. It then generally concludes with an identification of corresponding structure that often is unsupported by its selected excerpts.

Benson further confuses this process by asking the Court, for many elements, to determine the scope of a term, without considering its meaning. (*See* Benson Br. at pp. 14 and 16-19 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995))). *Markman* stands for the proposition that, "a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law." 52 F.3d at 978. It is illogical for a Court to determine the scope, or breadth, of a patent term, without first understanding the meaning of the claim language. Benson's request that the Court ignore the meaning of the claim language is without justification.

**B. Benson Misstates the Inventive Contribution of the '681 Patent.**

The inventive contribution of the '681 patent is emphasized in its specification and prosecution as the addition of multimedia capabilities to an audiometer to automate a hearing test. The '681 patent makes clear that it is not a specific structural configuration of the audiometer that is inventive, but rather, it is the ability to eliminate the human test administrator by automatically identifying errors and automatically providing corrective voice instructions.

To distinguish the claimed invention from the prior art cited by the Examiner, it was explained that these references taught only devices comparable in function to a conventional audiometer – or a dumb sound source with logical capabilities to provide certain pre-programmed

responses dictated by the test subject's inputs. (Ex. G at 8-12). It was emphasized that the claimed invention differed from the prior art in that it included multimedia capabilities that enabled an automatic testing environment. *Id*. Nowhere was it asserted that the distinguishing feature of the claimed invention was that the dumb sound source and computer of the prior art were combined in one element. Nor was the distinguishing feature asserted to be the simple addition of a computer to a conventional audiometer. Rather, it was emphasized that "an essence and tremendous advantage" of the claimed invention was the ability to "achieve an entirely or substantially automated audiometric testing environment." (Ex. G at 9).

**C. Claim 4.**

**1. *Multimedia Audiometer*.**

A *multimedia audiometer* is an audiometer, or instrument for measuring hearing, that is capable of intelligently and automatically presenting computer-generated corrective instructions upon the occurrence of test subject errors. (Bernafon Br. at 9-11). No evidence exists to the contrary.

**2. *Conventional Audiometer*.**

A *conventional audiometer* is defined as a device having both microprocessor and audio circuitry for administering a hearing test. (Bernafon Br. at 11-13). Benson agrees that it includes these elements, but further urges the improper importation of "pre-programmed logic for the hearing test." (Benson Br. at 10-11). The language of claim 4 informs that, in the context of claim 4, the pre-programmed logic resides in the *conventional audiometer*. Thus, defining the *conventional audiometer* to specifically include pre-programmed logic is redundant of the claim language and improper. Further, the specification teaches that the pre-programmed logic of claim 4, according to which test signals are generated, is a part of the microprocessor circuitry. (Ex. A at 4:56-66). It

would be illogical to require a pre-programmed logic separate from the microprocessor circuitry.

### 3. *Computer.*

Despite its improper analysis of the term *computer*, Benson reaches nearly the same result as Bernafon here. (Bernafon Br. at 13, Benson Br. at 11-12).

### 4. *Means for Outputting Sound Signals Generated From Digital Information of the Computer.*

The specified function of this element is "outputting sound signals generated from digital information of the computer", which is properly construed as "outputting analog signals representative of voice instructions and/or messages". (Bernafon's Br. at 14-15). Benson skips these initial steps of identifying and construing the claimed function, and immediately jumps to a recitation of one set of structure. The '681 patent identifies five alternate structures for performing this function, including a computer, a sound wave generator, and a multimedia converter, all of which Benson failed to identify. (Bernafon Br. at 15-16, Benson Br. at 15). The '681 patent also teaches that the multimedia output port of computer (102) (alternately a sound card), multimedia input interface (110), multimedia talkover card (118b), and earphone jack (48) may work together to perform this function. (Bernafon Br. at 15-16). Benson fails to include the multimedia output port of computer (102) and earphone jack (48), but includes the "sound port of the multimedia computer". (Benson Br. at 15). This sound port, however, finds no support in the specification. Benson quotes the specification saying, "sound signals passed to the sound port [120] from the computer [102]". (Benson Br. at 15). Benson summarizes this passage as requiring that the corresponding structure include "the sound port **from** the multimedia computer", from which Benson concludes that the corresponding structure is "the sound port **of** the multimedia computer." (Benson Br. at 15)

(Emphasis added). This conclusion is illogical – the sound port (120) is not a part of computer (102), and the corresponding structure cannot include it. (Ex. A at 7:66-8:1).

**5. *Pre-programmed Logic*.**

*Pre-programmed logic* is the software and/or hardware that provides preset responses dictated by the test subject's inputs. (Bernafon's Br. at 16-17). Here, Benson does not propose a definition, but attempts only to import a "for the hearing test" functional limitation. (Benson Br. at 18-19). Nothing in the intrinsic evidence supports the inclusion of this limitation. Claim 4 was amended during prosecution to specify the existence of *pre-programmed logic* in the conventional audiometer to better distinguish the conventional audiometer from the dumb sound sources of the cited prior art which provided only a detectable output and were non-responsive to the test subject's inputs. (Ex. G). Nowhere in the intrinsic evidence is it asserted that the *pre-programmed logic* is for "running a hearing test". Benson's construction is unsupported by the facts, and must be rejected.

**6. *Means for Outputting Test Signals Generated by the Conventional Audiometer According to Pre-programmed Logic of the Conventional Audiometer*.**

The function of this element is: *outputting test signals generated by the conventional audiometer according to pre-programmed logic of the conventional audiometer*. The parties agree that *test signals generated by the conventional audiometer* are test tones. Thus, *outputting test signals generated by the conventional audiometer* is properly construed as outputting test tones. For performing this function, the specification teaches a conventional audiometer or device having both microprocessor and audio circuitry for administering a hearing test. (Bernafon Br. at 17-18). Contrary to Benson's assertions, no disclosure, explicit or otherwise, exists to support a finding that the corresponding structure is a tone generator in a conventional audiometer. (*See* Benson Br. at 16).

**7. *Means for Switching Between the Means for Outputting Sound Signals and the Means for Outputting Test Signals*.**

The function, *switching between the means for outputting sound signals and the means for outputting test signals*, is properly construed as alternately enabling the means for outputting sound signals and the means for outputting test signals to output an audible sound. (Bernafon Br. at 18-19). In identifying structure, Benson agrees that switches 66(a,b)[1] perform this function, but fails to include multimedia talkover card (118b) and improperly associates relays (64a,b) with the means for controlling. (Bernafon Br. at 19-20; Benson Br. at 13). Because relays (64a,b) are controlled by computer (102) to only trigger, not control, switches (66a,b), they should be included with switches (66a,b) as structure for performing the *means for switching*.

**8. *Means for Controlling the Means for Switching*.**

The function, *controlling the means for switching*, is properly construed as intelligently and automatically directing the means for switching to enable the means for outputting sound signals to output voice instructions and/or messages upon the occurrence of a test subject error. (Bernafon's Br. at 20-21). Benson agrees with Bernafon that computer (102) corresponds to this element, but further urges the importation of relays (64a,b). (Benson Br. at 14-15). Because relays (64a,b) do not control switches (66a,b), but only respond to the control exerted by computer (102) to trigger switches (66a,b), they do not correspond to the *means for controlling the means for switching*.

**D. Claim 6.**

**1. *Audiometer*.**

The plain and ordinary meaning of *audiometer*, or *audiometer testing device*, is an instrument

---

[1] Nothing in the specification requires the switches to be "mechanical switches" as proposed by Benson.

for measuring hearing. (Bernafon Br. at 22). In its analysis, Benson ignores the ordinary meaning of this language, and instead urges that "a computer and a conventional audiometer" be imported into the definition. (Benson Br. at 12-13). Contrary to Benson's arguments, however, the 2/25/98 Amendment did not define the term *audiometer* as a conventional audiometer and a separate computer. Nor did it disavow claim scope outside of a conventional audiometer and a separate computer. *See Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002) (explaining that disavowal of claim scope requires a clear and unambiguous surrender of subject matter during prosecution). Rather, it was argued only that the cited prior art devices, which had a dumb sound source and logical capabilities, were analogous to a conventional audiometer, and that the claimed invention added automatic error correction capabilities. Nowhere was it argued that the claimed invention only covered devices having a conventional audiometer and a separate computer. Nor does the fact that claim 4 was amended to specify that its multimedia audiometer included a conventional audiometer and a computer imply that the term *audiometer* of claim 6 must also include both elements. Rather, the fact that claim 6 was not similarly amended leads logically to the opposite conclusion that the *audiometer* need not include both elements.

**2. *Sound Wave Generator*.**

The *sound wave generator* is a device for generating longitudinal pressure waves of audible or inaudible sound, including analog signals representative of voice instructions and/or messages. (Bernafon Br. at 22-23). Benson does not propose a definition of this element, but seeks only to locate it in the computer – an element not found in claim 6. (Benson Br. at 14). Here, Benson ignores the ordinary meaning and argues that because sound signals are output by the computer in a preferred embodiment of the patent, the *sound wave generator* must be in the computer. Benson's

attempt to import this limitation from a preferred embodiment must be rejected. *See Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986).

**3. *Test Signal Generator*.**

The parties agree that a *test signal* is a test tone. Thus, a *test signal generator* is properly construed as a device for generating test tones. (Bernafon Br. at 23). Benson does not propose a definition of this element, but seeks only to locate it in the conventional audiometer – an element not found in claim 6. (Benson Br. at 15-16). Nothing in the intrinsic evidence requires this construction.

**4. *Logic Circuit Connected with the Test Signal Generator and the Processor*.**

The plain and ordinary meaning of the *logic circuit* is the hardware and/or software used for performing a specified function. (Bernafon Br. at 24). The 2/25/98 Amendment which added the *logic circuit* clarifies that the *logic circuit* functions to "provide certain pre-programmed responses dictated by the test subject's inputs" that did not exist in the prior art dumb sound sources. (Ex. G at 9). Bernafon now modifies its proposed construction of the *logic circuit* to be the software and/or hardware that provides pre-programmed, or preset, responses dictated by the test subject's inputs.

Benson again does not propose a definition here, but seeks only to import a "for the hearing test" functional limitation and an "in the conventional audiometer" structural limitation. The intrinsic evidence does not support this construction. Claim 6 includes a *logic circuit* connected to a processor and a test signal generator. The *logic circuit* adds intelligence to the test signal generator, such that together, they can do more than merely provide a detectable output – they can provide certain pre-programmed responses dictated by the test subject's inputs. (Ex. G at 9). Nowhere in the intrinsic evidence is it alleged that the *logic circuit* is for "running a hearing test" or that the *logic circuit* must reside in an audiometer. Benson's proposed construction is unsupported by the facts.

**5. The *Wherein* Clause.**

Bernafon has herein modified its proposed construction of this clause to account for its modified construction for the *logic circuit*. The invention of the '681 patent is an audiometer that outputs either sound signals or test signals, but not both simultaneously. The act of switching between the output of sound signals and test signals does not occur randomly or arbitrarily. Rather, the crux of the '681 invention is that this switching is directed in an intelligent and automatic fashion. If it is determined that the test subject has erred, the sound signal generator is directed to pass appropriate, corrective instructions to the test subject. (Ex. A at 12:19-23, 10:8-19). Once the test subject receives the corrective instruction, the test signal generator is directed to again output test tones. (Ex. A at 10:35-45). Thus, the *wherein* clause is properly construed as requiring the *processor* to intelligently and automatically direct either the *logic circuit* to cause the test signal generator to deliver test tones or, following the occurrence of a test subject error, the *sound wave generator* to output computer-generated corrective instructions.

**CONCLUSION**

Pursuant to the foregoing discussion, Bernafon respectfully requests that the court adopt its proposed construction of the disputed terms of the '681 patent.

Respectfully submitted,

Dated: July 23, 2004

By: **s/ Michael J. Pape**

David R. Fairbairn (No. 28,125)
Michael J. Pape (No. 26,989X)
Dina M. Khaled (No. 284,968)
KINNEY & LANGE, P.A.
312 South Third Street
Minneapolis, Minnesota 55415
(612) 339-1863

**ATTORNEYS FOR BERNAFON, INC.**