**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**BERNAFON, INC.**, Civil No. 02-777 (JNE/JGL)
Civil No. 02-3466 (JNE/JGL)

Plaintiff,

v.

**BENSON MEDICAL INSTRUMENTS COMPANY**,

Defendant.

# DEFENDANT'S RESPONSE CLAIM CONSTRUCTION BRIEF[1]

## I. INTRODUCTION

Defendant Benson Medical Instruments Company ("Benson Medical") submits this Response Claim Construction Brief for U.S. Patent Numbers 5,811,681 ("the '681 Patent") and 6,416,482 ("the '482 Patent"). [Ex. A and Ex. B, respectively].[2] In its Opening Claim Construction Briefs,[3] Plaintiff ignored the arguments that the patentees made during the prosecution of the '681 Patent and did not even address the fact that those arguments affected the scope of the '482 Patent, which was a continuation of the '681 Patent. Without the patentees' arguments during the prosecution of the '681 Patent, neither of the patents-in-suit would have issued, as all of the claims of the '681 Patent stood rejected in light of three significant prior art

[1] The combined total number of pages for Defendant's Opening and Response Claim Construction Briefs is 37 pages, two pages over the limit set by LR 7.1(c). Defendant respectfully requests that the Court consider all 37 pages of Defendant's Briefs, particularly given the fact that Plaintiff filed a total of four briefs, with a collective total of 64 pages.

[2] All Exhibits referred to in Defendant's Response Claim Construction Brief are attached to the Declaration of Aaron W. Davis, which was submitted with Defendant's Opening Claim Construction Brief.

patents. With its constructions, Defendant construes the patents consistent with the scope of claim coverage waived by the patentees via their arguments concerning those prior art patents.

In its Openings Briefs, Plaintiff even argued that the '482 Patent was filed in an attempt to get back the coverage that was disclaimed during the prosecution of the '681 Patent, which is contrary to Federal Circuit law that arguments made during the prosecution of a parent application affect the scope of later-filed child applications. With its continuation practice, Plaintiff is attempting to reclaim that which was disavowed during prosecution. This attempt is contrary to established patent law principles and the public notice function of the patent system, and should not be allowed.

Further, most of Plaintiff's definitions are more ambiguous and less understandable than the words of the claims themselves. Such a complication of the claim language does nothing to clarify the metes and bounds of the claimed invention. In contrast, Defendant's suggested claim construction maintains the inherent meaning of the claim language itself (and often does not change the claim language at all), while defining the scope of the claim terms, consistent with the patentees' arguments and amendments during prosecution. Accordingly, Defendant's suggested claim construction should be adopted and Plaintiff's should be rejected.

## II. ARGUMENT

### A. WITH MUCH OF ITS CONSTRUCTION, PLAINTIFF IGNORED THE PROSECUTION HISTORY OF THE '681 PATENT, THE PRIOR ART, AND THEIR NARROWING EFFECT ON THE SCOPE OF THE PATENTS AT ISSUE.

Several of the terms that Plaintiff construed entirely ignored the arguments that the patentees made during the prosecution of the '681 Patent. To adopt construction that ignores the

[3] Unlike Defendant who only filed one, Plaintiff filed two separate Opening Claim Construction Briefs. This appears to have been done in an effort to distance the child '482 Patent from its parent, the '681 Patent, and the arguments made during its prosecution.

arguments made during prosecution would be improper, as it would allow Plaintiff to reclaim that which the patentees disclaimed during prosecution. See, e.g., Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.").

In particular, Plaintiff implies that because the patentees were dissatisfied with the scope of the '681 Patent, they filed an application for the '482 Patent that "contain[ed] claims identical to the initially rejected claims" of the '681 Patent.[4] Despite Plaintiff's admission that the claims of the '482 Patent are similar (or "identical," as Plaintiff puts it), Plaintiff entirely disregards the effect of the '681 Patent's prosecution history on the scope of the '482 Patent. It is black letter Federal Circuit law that "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999); Augustine Medical, Inc. v. Gaymar Industries, Inc., 181 F.3d 1291, 1300 (Fed. Cir. 1999) ("because the prosecution history of a parent application may limit the scope of a later application using the same claim term, … claim construction and arguments restrict the scope of the claims in each of the later issued patents containing the [same] limitation").[5] This is consistent with the Federal Circuit's mandate that "prosecution history prevents a patentee from recapturing subject matter surrendered during prosecution of a patent." Augustine Medical, 181 F.3d at 1298. Plaintiff's flouting of the prosecution history, as well as the many other problems with Plaintiff's constructions, are discussed in detail below.

---

[4] Plaintiff's Opening '681 Brief, p. 7 and Plaintiff's Opening '482 Brief, p. 4.

**1. Conventional Audiometer.**

Both Plaintiff's and Defendant's constructions for "conventional audiometer" require microprocessor and audio circuitry. However, Plaintiff's construction overlooks the requirement that the pre-programmed test logic must be contained in the conventional audiometer. In fact, the fundamental problem with several of Plaintiff's definitions is that they ignore the two core elements that together distinguish Plaintiff's invention from the prior art: (1) the pre-programmed test logic must be located in the conventional audiometer; and (2) the invention must include a conventional audiometer (which contains the pre-programmed logic for the hearing test and a computer of its own) and another computer with multimedia functions.

Plaintiff's definitional shortcoming is exemplified by its proposed construction of "conventional audiometer," which according to Plaintiff means "a device having both microprocessor and audio circuitry for administering a hearing test." Defendant's proposed construction, on the other hand, takes "pre-programmed logic" into consideration in its definition of "conventional audiometer": "microprocessor circuitry, audio circuitry, and pre-programmed logic for the hearing test."

The patentees made several statements that illustrate that the pre-programmed logic for the hearing test must be located in the "conventional audiometer." For example, claim 4 of the '681 Patent expressly states that "test signals [are] generated by the conventional audiometer according to pre-programmed logic of the conventional audiometer." [Ex. A., col. 13, lns. 48-50 (emphasis added)]. The location of the pre-programmed logic in the conventional audiometer, as well as the importance of the second computer, is also confirmed by the patentees' arguments made during the prosecution of the '681 Patent in response to the Moser Patent:

---

[5] See also Alloc, Inc. v. ITC, 342 F.3d 1361, 1372 (Fed. Cir. 2003); Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1027 (Fed. Cir. 1997); Jonsson v. The Stanley Works, 903 F.2d 812, 817-818 (Fed. Cir. 1990).

> Applicants' claimed invention, on the other hand, comprises a computer and a conventional audiometer. The conventional audiometer is, in effect, the Moser device, i.e., a sound source and a computer. The audiometer includes stored sound sequences that <u>are selected by a processor of the audiometer to be output in a select succession or predetermined program according to a logical procedure</u> responsive to a test subject's input. The audiometer, thus, includes a stored sound sequence function of the CD player (albeit not necessarily a laser-read device like a CD player) <u>and test sequencing function of the computer (albeit an internal processor or logic circuitry, rather than a stand-alone external computer)</u>. In addition to this conventional audiometer analogous to the Moser device, <u>Applicant's claimed invention includes another computer</u> with its own processor, memory and peripherals. This additional computer allows multimedia functions to be added to the conventional audiometer.

[Ex. C, paper 10, pp. 8-9 (emphasis added)]. The patentees further argued to the Examiner that "[t]he conventional audiometer has certain, but limited, logical functions during the testing procedure. Those logical functions provide certain pre-programmed responses dictated by the test subject's inputs." [Ex. C, paper 10, p. 9].

The patentees further distinguished the invention of the '681 Patent from the prior art by statements such as: "Moser does not include in the CD player a pre-programmed logic;" "[the tone generator of the Slavin Patent] does not include any logical operations;" and "Applicants' claimed invention differs [from Slavin] in that the audiometer that provides the test signals has certain limited capabilities to conduct the test responsive to the test subject's inputs." [Ex. C, paper 10, pp. 10-11]. The patentees' invention placed the pre-programmed testing logic in the conventional audiometer and included a second computer that added multimedia functions. Instead of simply being a "dumb sound source" and a computer, like the prior art described by Plaintiff, the "conventional audiometer" (with the hearing test logic) in the context of the patents-at-issue is accompanied by another computer with multimedia functions. Without the required "conventional audiometer" containing pre-programmed logic for the hearing test and separate computer with multimedia functions, Plaintiff would be allowed to reclaim what was

given up during prosecution. See Southwall, 54 F.3d at 1576. This would be reversible error and impermissibly allow claims of the asserted patents to cover the prior art Moser, Slavin, and Delisle devices. Accordingly, Defendant's construction for "conventional audiometer," which includes the pre-programmed logic for the hearing test, should be adopted.

**2. Audiometer.**

Plaintiff proposes to define "audiometer" as simply "an instrument for measuring hearing." But according to the patentees, the inventions of Moser, Slavin, and Delisle were all "instruments for measuring hearing." Again, with its definition of "audiometer," Plaintiff attempts to reclaim that which was disavowed during prosecution. As was discussed in the section above on "conventional audiometer," a key component of Plaintiff's invention is the inclusion of two computers, one in the conventional audiometer (which includes the test logic) and another containing multimedia functions. [See Ex. C, paper 10, pp. 8-9 (Applicants' invention, on the other hand, comprises a computer and a conventional audiometer. …This is an essence and tremendous advantage of Applicants' claimed invention. Applicants can use a conventional audiometer, add a computer with multimedia operations, and achieve an entirely and substantially automated audiometric testing environment.")]. If "audiometer," in the context of claim 6 of the '681 Patent and claim 1 of the '482 Patent, does not include both a conventional audiometer and a computer, Plaintiff will have been allowed to reclaim what was given up during prosecution and what distinguished its invention over the prior art of Moser, Slavin, and Delisle. Defendant's construction of "audiometer" ("a conventional audiometer and a computer") accurately captures the "essence" of Plaintiff's claimed invention, as described by the patentees.[6]

---

[6] As stated in its Opening Claim Construction Brief, Defendant believes that if its construction for "audiometer" is adopted by the Court, no separate construction for "multimedia audiometer" need be

### 3. A Logic Circuit Connected With The Test Signal Generator and Processor.

Plaintiff's construction of this phrase is faulty because it does not take into consideration the fact that the logic circuit for the hearing test must be located in the conventional audiometer. As was outlined in Section II(A)(1) above, the patentees made several arguments during the prosecution of the '681 Patent that the pre-programmed logic or the logic circuitry was located in the conventional audiometer. [See Ex. C, paper 10, pp. 8-11]. In particular, the patentees argued that the logic circuitry was located in the conventional audiometer and that a second computer with multimedia functions added other multimedia operations. [See Ex. C, paper 10, p. 9]. Besides not considering the location of the logic circuit within the audiometer, Plaintiff's construction of the above phrase as "hardware and/or software for alternatively enabling either the sound wave generator or the test signal generator to output discernible signals" makes the phrase less understandable than the language of the phrase itself. Moreover, in Plaintiff's proposed construction, the term "sound wave generator" and the phrase "for alternatively enabling" are inexplicably added to the limitation, both of which are contrary to the plain language of the claim limitation. "Courts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee." K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1364 (Fed. Cir. 1999). Accordingly, Plaintiff's definition that ignores the prosecution history, as well as the plain language of the claim, should be rejected and Defendant's construction of this phrase should be adopted by the Court.

---

made. This is so because during the prosecution of the '681 Patent, Plaintiff distinguished its "audiometer" invention from all "conventional audiometers" then existing. [See Section II(A)(2) above]. Thus, any "audiometer," other than a "conventional audiometer," claimed by the patentees must include a computer and a conventional audiometer.

### B. **"ANALOG SIGNAL" AND "ANALOG SOUND" SHOULD HAVE DIFFERENT CONSTRUCTIONS.**

Plaintiff has proposed identical constructions for the terms "analog sound" and "analog signal" that both appear in claim 9 of the '482 Patent, despite the fact that "the use of [two different] terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each." Bancorp Services, LLC v. Hartford Life Ins. Co., 359 F.3d 1367, 1373 (Fed. Cir. 2004); see also Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1579 (Fed. Cir. 1996). While Plaintiff identified some cites from the '482 Patent that discuss "sound signals," Plaintiff has not shown that "analog signal" and "analog sound" mean the same thing. Granted, the two terms may be related (i.e., the sound may be derived from the signal), but it does not follow that they have the same meaning. Thus, Defendant's proposed constructions for "analog signal"[7] and "analog sound"[8] should be adopted.

### C. **MANY OF PLAINTIFF'S PROPOSED CONSTRUCTIONS DO NOT TAKE INTO CONSIDERATION SCOPE ARGUMENTS FROM THE PROSECUTION HISTORY AND ARE MORE COMPLICATED THAN THE CLAIM LANGUAGE ITSELF.**

As with the specific claim terms and phrases discussed above, with its proposed constructions, Plaintiff did not adequately address the arguments that the patentees made during the prosecution of the '681 Patent that affect the scope of the claim terms from both the '681 and '482 Patents. See, e.g., Minton v. National Ass'n. of Securities Dealers, Inc., 336 F.3d 1373, 1376 (Fed. Cir. 2003) (claim construction is a legal determination during which the court determines the scope and meaning of the patent claims). It is apparent from Plaintiff's mere one (1) page (out of a 26-page brief) mention of the prosecution history of the '681 Patent that

[7] "Analog signal" means "a continuously variable, measurable, physical quantity or impulse (as a voltage, current, or magnetic field strength) by which messages or information can be transmitted."
[8] "Analog sound" means "continuously variable, measurable, physical quantities perceived by the sense of hearing."

Plaintiff would rather ignore the arguments made during the prosecution history than discuss them directly. [Plaintiff's Opening '681 Brief, p. 7]. In fact, Plaintiff makes no mention of the prosecution history of the '681 Patent in its brief on the '482 Patent other than to imply that the prosecution history does not apply to the '482 Patent. [Plaintiff's Opening '482 Brief, p. 4].

Given that the '482 Patent was a continuation of the '681 Patent with, as Plaintiff put it, "claims … identical to the original claims"[9] of the '681 Patent, the patentees' prior arguments are applicable to the '482 Patent, according to Federal Circuit precedent. See Elkay, 192 F.3d at 980; Augustine Medical, 181 F.3d at 1300. This prevents the patentees from taking "a second bite at the apple" in an "identical" or very similar continuation application (with a different patent examiner) when they had to disclaim claim scope in order to gain the allowance of the parent application in the first place. See Southwall Techs., 54 F.3d at 1576 ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."); Pall Corp. v. PTI Techs., Inc., 259 F.3d 1383, 1392-93 (Fed. Cir. 2001) (collecting cases). Here, Plaintiff has boldly admitted that with the '482 Patent, the patentees were trying to reclaim that which was disclaimed during the prosecution of the '681 Patent. [See Opening '482 Brief, p. 4 (one of the patentees explained that the '482 Patent "application was filed because it was believed that the '681 Patent did not receive the broad coverage as was due")]. This type of practice, wherein disclaimed scope from a parent application is reclaimed in an "identical" continuation application, is contrary to the public notice function of patents and their prosecution histories and should not be countenanced by this Court. See Digital Buimetrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1347 (Fed. Cir. 1998) ("The public has a right to rely on … definitive statements made during prosecution.").

---

[9] Plaintiff's Opening '681 Brief, p. 7 and Plaintiff's Opening '482 Brief, p. 4.

Also, many of Plaintiff's proposed constructions are more complicated than the claim language itself. One of the primary purposes of claim construction is to clarify an ambiguous claim term for the benefit of the ultimate fact finder, either the Court or a jury. Not only do Defendant's proposed constructions accurately reflect the patentees' prosecution arguments, they also are more readily understandable and retain as much as of the original claim language as possible. See Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998) (stating that for claim construction, "[t]he actual words of the claim are the controlling focus"). Moreover, one of ordinary skill in the art would know what many of the claim terms mean without Plaintiff's complicated and lengthy constructions, which do not simplify the fact-finder's ultimate jobs of making determinations regarding issues of infringement and validity. See, e.g., Senmed, Inc. v. Richard-Allan Med. Indus., Inc., 888 F.2d 815, 819 n.8 (Fed. Cir. 1989) ("Lawyers may create a 'dispute' about any word, but there is nothing ambiguous or linguistically obscure about [the disputed claim term] as used in the present claim."). Therefore, Plaintiff's overly complicated proposed constructions should be rejected.

Defendant briefly discuss the problems with Plaintiff's proposed constructions below:

| Claim Term | Plaintiff's proposed construction | Problem with Plaintiff's proposed construction |
|---|---|---|
| Computer | "a personal computer, another type of computer, or some other processing and storage device having multimedia capabilities" | Plaintiff's proposed construction is basically the same as Defendant's proposal; however, Defendant's construction is much shorter and simpler. |
| Means for outputting sound signals generated from digital information of the | "outputting analog signals representative of voice instructions and/or messages" | There is nothing in the "means" phrase that needs construction. In fact, Plaintiff's construction is more complicated than the claim language itself. Thus, the "means" phrase |

[10] While Defendant prefers the structure for this means-plus-function claim term identified in its Proposed Order, Defendant does not object to the structure identified by Plaintiff for this means claim term. See Plaintiff's Opening '681 Brief, p. 15(b).

| Claim Term | Plaintiff's proposed construction | Problem with Plaintiff's proposed construction |
|---|---|---|
| computer | | should not be construed.[10] |
| Pre-programmed logic | "Software and/or hardware that provides preset responses dictated by the test subject's inputs" | Again, while Defendant does not necessarily disagree with Plaintiff's proposal, this construction is more complicated than Defendant's straightforward proposal. |
| Means for outputting test signals generated by the conventional audiometer according to pre-programmed logic of the conventional audiometer | "outputting test tones" | This proposed construction is faulty because: (1) it ignores the patentees' arguments from the prosecution that requires the test signals be generated by the conventional audiometer according to the pre-programmed logic of the conventional audiometer; (2) the claim language is clear on its face; and (3) it eliminates a large part of the claim language, improperly broadening and reading out much of the claim limitation. See Exxon Chemical Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1557 (Fed. Cir. 1995) (recognizing that the Federal Circuit "must give meaning to all the words in [the] claims").<br><br>Further, the structure required for the means should be limited to "tone generator in the conventional audiometer," which is consistent with the patentees' arguments in the prosecution history. |
| Means for switching between the means for outputting sound signals and the means for outputting test signals | "alternately enabling the means for outputting sound signals and the means for outputting test signals to output an audible sound" | Plaintiff's proposal is far more complicated than the claim language itself.<br><br>Defendant does not object to the structure identified as required by Plaintiff under 35 U.S.C. § 112 ¶ 6. |
| Means for controlling the means for switching | "Intelligently and automatically directing the means for switching to enable the means for outputting sound signals to output voice instructions and/or messages upon the occurrence of a test subject error" | Plaintiff's proposal is far more complicated than the claim language itself. Also, the language "intelligently" is unsupported by the specification, file history, and dictionary definitions.<br><br>While Defendant prefers the structure for this means-plus-function claim term identified in its Proposed Order, Defendant does not object to the structure identified by Plaintiff for this means claim term. |
| | | |

| Claim Term | Plaintiff's proposed construction | Problem with Plaintiff's proposed construction |
|---|---|---|
| Sound wave generator | "A device for generating longitudinal pressure waves of audible or inaudible sound, including analog signals representative of voice instructions and/or messages." | Plaintiff's proposal is far more complicated than the claim language itself and will only confuse the fact-finder. This is a simple claim term that just needs the inclusion of the scope limitation, as evidenced in Defendant's proposal. |
| Test signal generator | "A device for generating test tones" | This proposed construction is faulty because: (1) it ignores the patentees' arguments from the prosecution that requires the test signals to be generated by the conventional audiometer; and (2) the claim language is clear on its face; it does not need to be reworded, as Plaintiff proposed. |
| Wherein clause (Wherein the logic circuit and the sound wave generator are controlled by the processor to selectively cause either the sound wave generator or the test signal generator to output discernable signals) | "Intelligently and automatically adjust the logic circuit to deliver either test tones or, following the occurrence of a test subject error, computer-generated corrective instructions." | This proposed construction is faulty because: (1) it ignores the patentees' arguments from the prosecution regarding the scope of the limitation, including the location of the logic circuit, sound wave generator, and the test signal generator; (2) the claim language is clear on its face; and (3) it completely re-writes the limitation, which is improper. See Exxon Chemical, 64 F.3d at 1557 (recognizing that the Federal Circuit "must give meaning to all the words in [the] claims").[11]<br><br>Also, the language "intelligently" is unsupported by the specification, file history, and dictionary definitions. |
| Sound signals generated from digital information | "Analog signals representative of voice instructions and/or messages" | This proposed construction is faulty because: (1) it ignores the patentees' arguments from the prosecution that requires the digital information be stored in the computer; and (2) the claim language is clear on its face; Plaintiff's proposal is far more complicated than the claim language itself and essentially rewrites the limitation. |
| Tone generator | "A device for generating tones." | This proposed construction is faulty because: (1) it ignores the patentees' arguments from the prosecution that requires the tones be generated by the conventional audiometer; and (2) the |

[11] See also K-2 Corp., 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

| Claim Term | Plaintiff's proposed construction | Problem with Plaintiff's proposed construction |
|---|---|---|
| | | claim language is clear on its face; it does not need to be reworded, as Plaintiff proposed. |
| Generating a test tone | "generating a tone, or a sound of distinct pitch, quality and duration" | This proposal is faulty because: (1) it ignores the patentees' arguments from the prosecution that requires the test tones be generated by the conventional audiometer; and (2) the claim language is clear on its face; it does not need to be reworded, as Plaintiff proposed. |

As a general matter, Defendant's proposed constructions would be far more understandable by a fact-finder and one of ordinary skill in the art of audiometers. Most of Plaintiff's proposed constructions would require additional construction of the proposed constructions to make them understandable and useful.[12] Furthermore, Plaintiff's proposed construction disregards the arguments made by the patentees during the prosecution of the '681 Patent, which limited the scope of the claims at issue. Thus, the Court should adopt Defendant's proposed constructions for the above-discussed claim terms, as outlined in Defendant's Proposed Order.

### D. <u>SEVERAL OF THE TERMS THAT PLAINTIFF CONSTRUES DO NOT NEED TO BE AND SHOULD NOT BE CONSTRUED BY THE COURT.</u>

In its Opening Briefs, Plaintiff proposed constructions for the following claim limitations:

1. Controlling the audiometer to selectively switch the audiometer output between test tones generated by the audiometer and sound signals generated from digital information;
2. First switching the audiometer output to sound signals when the step of controlling indicates a particular condition;
3. Switch selectively causes either the tone generator or the computer to output sound waves, and the computer controls the switch;
4. Switching the audible sound from the step of outputting between test tone and the analog signal; and

[12] This would be contrary to the purpose of claim construction, which is "a matter of resolution of disputed meanings and technical scope, <u>to clarify and when necessary to explain what the patentee covered by the claims</u>, [and] for use in the determination of infringement." <u>U.S. Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (emphasis added).

5. Controlling the steps of outputting, generating the test tone, storing, generating the analog sound and switching.

Just because Plaintiff proposed a construction for these limitations, however, does not mean that the Court need construe them. See, e.g., Senmed, 888 F.2d at 819 n.8 ("Lawyers may create a 'dispute' about any word, but there is nothing ambiguous or linguistically obscure about [the disputed claim term] as used in the present claim."); Lucent Technologies, Inc. v. Newbridge Networks Corp., 168 F. Supp. 2d 181, 191 n.3 (D. Del. 2001) (stating that claim terms that were "self-explanatory" required no additional construction); Goldtouch Techs., Inc. v. Microsoft Corp., Civil No. A99CA336SS, 2000 WL 85555, *4 (W.D. Tex. Jan. 14, 2000) (the court found "the claim language to be sufficiently clear and self-explanatory … so that no further definition is necessary"). The Court will be individually construing many of claim terms that appear in 1-5 above, so a separate construction of the limitations as a whole is unnecessary and duplicative. Moreover, individually construing these lengthy claim limitations as requested by Plaintiff would read out parts of the claim limitations and in essence re-write the claims. See K-2 Corp., 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); Exxon Chemical, 64 F.3d at 1557 (recognizing that the Federal Circuit "must give meaning to all the words in [the] claims"); Digital Biometrics, 149 F.3d at 1344 (stating that for claim construction, "[t]he actual words of the claim are the controlling focus"). Accordingly, claim limitations 1-5 listed above should not be further construed, i.e., rewritten by the Court.

Defendant has also proposed that the terms "multimedia audiometer" and "multimedia computer" not be further construed. As was stated in its Opening Brief, Defendant believes that if the proper construction is given to the terms "audiometer" and "computer," the "multimedia"

requirement will already be addressed by the construction of those terms and no additional, separate construction of "multimedia audiometer" and "multimedia computer" will be required.

## III. CONCLUSION

Defendant's proposed constructions more accurately reflect the patentees' arguments during prosecution and the scope of the claim terms. They are also more understandable than Plaintiff's. Therefore, Defendant respectfully requests that the Court adopt Defendant's proposed claim construction as summarized in the Proposed Order submitted by Defendant with its Opening Claim Construction Brief.

Dated: July 23, 2004

By: s/ Aaron W. Davis
Randall T. Skaar (No. 165,013)
Aaron W. Davis (No. 318,255)
PATTERSON, THUENTE, SKAAR & CHRISTENSEN, P.A.
4800 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2100
Telephone: (612) 349-5740
Facsimile: (612) 349-9266

Joanne H. Turner (No. 235,787)
MACKALL, CROUNSE, & MOORE, PLC.
1400 AT&T Tower
901 Marquette Avenue
Minneapolis, MN 55402
Telephone: (612) 305-1400
Facsimile: (612) 305-1414

**ATTORNEYS FOR DEFENDANT BENSON MEDICAL INSTRUMENTS COMPANY**